## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GIGAMONSTER NETWORKS, LLC., *et al.*,[1] | Case No. 23-10051 (JKS) |
| Debtors. | (Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF GIGAMONSTER NETWORKS, LLC, *et al.,* | Adv. Case No. 23-50404 (JKS) |
| Plaintiff, | |
| v. | |
| BARINGS ASSET-BASED INCOME FUND (US), L.P., BABIF GIGABLOCKER LLC, MATTHEW SANDOVAL, W.F. (ROONEY) DEBUTTS, NISANTH REDDY, and JULIE NIEDZWIECKI, | |
| Defendants. | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF</u>
## <u>BARINGS DEFENDANTS' MOTION TO DISMISS</u>

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Andrew Remming
Sophie Rogers Churchill
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: ARemming@morrisnichols.com
    srchurchill@morrisnichols.com

**HOGAN LOVELLS US LLP**
Pieter Van Tol
Christopher R. Bryant
390 Madison Avenue
New York, New York 10017
Telephone: (212) 983-3000
Email: pieter.vantol@hoganlovells.com
    chris.bryant@hoganlovells.com

-and-

---

[1]    The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: GigaMonster Networks, LLC (2854); GigaSphere Holdings LLC (0250); GigaMonster, LLC (3014); Fibersphere Communications LLC (0163); and Fibersphere Communications of California LLC (5088). The Debtors' business address is 350 Franklin Gateway, Suite 300, Marietta, GA 30067.

**HOGAN LOVELLS US LLP**
Erin N. Brady
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile: (310) 785-4601
Email: erin.brady@hoganlovells.com

*Counsel for Barings Defendants (as defined below)*

Dated: July 24, 2023

# TABLE OF CONTENTS

NATURE AND STATE OF PROCEEDINGS ................................................................1

SUMMARY OF ARGUMENT ...................................................................................1

STATEMENT OF RELEVANT FACTS ......................................................................3

    I.     Barings' Acquisition in November 2019 .................................................3

    II.    The LLCA Addresses the Investors' Rights to Provide Debt and Equity to GigaSphere Holdings and Subsidiaries ...................................................3

          A.     Board Composition and Governance .......................................... 3

          B.     Provisions Protective of Preferred Shareholders: Preemptive Rights and Member Loan Protections ....................................................... 4

    III.   Barings Makes a Loan to GigaSphere Holdings' Subsidiary, GigaMonster Networks .................................................................................................5

    IV.   GigaSphere Holdings Forms a Restructuring Committee and Barings Waives its Majority Interest Rights ..........................................................................7

    V.    The Forbearance Agreement .................................................................7

    VI.   The Second Forbearance Agreement and Consent .................................8

STANDARD FOR A RULE 12(B)(6) MOTION TO DISMISS ......................................9

ARGUMENT ..........................................................................................................9

    I.     The Committee Has Failed to State a Claim for Recharacterization .......9

          A.     Names Given to the Instruments ............................................... 11

          B.     Fixed Maturity Date, Interest Rate and Repayment Terms ...... 11

          C.     The Source of Repayments ....................................................... 13

          D.     Undercapitalization .................................................................. 14

          E.     Identity of Interest .................................................................... 16

          F.     The Security Provided for the Advances ................................... 17

          G.     Ability of Debtor to Obtain Outside Financing ......................... 17

          Subordination of Advances to Outside Creditors ................................. 18

          H.     Advances Used to Acquire Capital Assets ................................ 18

          I.     The Presence or Absence of a Sinking Fund ............................. 19

          J.     Barings Was Prohibited From Investing Additional Capital as Equity .... 19

    II.    The Committee has Failed to State a Claim for Equitable Subordination ............20

          A.     The Committee Failed to Plead Facts Plausibly Showing Inequitable Conduct by Barings .................................................................21

B.      The Committee Fails to Allege Barings' Gain or Creditor Harm as a Result of Barings' Purported Inequitable Conduct ................................... 22

C.      Equitable Subordination Would be Contrary to the Bankruptcy Code ..... 23

III.    The Committee Has Failed to State a Claim to Avoid Prepetition Legal Fees as a Fraudulent Transfer ............................................................................... 24

IV.    The Committee has Failed to State a Claim for Avoidance of Post-Petition Legal Fees Authorized under the Final DIP Order ......................................... 26

V.    The Committee has Failed to State a Claim to Avoid the Security Interest Transfer as a Preference ....................................................................................... 27

VI.    The Claim for Declaratory Judgment Regarding Perfection of the Trademark Must be Dismissed ....................................................................................... 29

VII.   The Committee's Claims Against the Individual Defendants Should Be Dismissed ....................................................................................................... 30

A.      The Committee Lacks Standing to Bring Claims Against the Individual Defendants Because the Debtors Released Those Claims ........................ 31

B.      The Claims Against the Individual Defendants Fail as a Matter of Law .. 33

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Grp. of Second Lien Creditors v. LNV Corp (In re Paloma Generating Co.)*,
  609 B.R. 80 (D. Del. 2019) ............................................................................28, 35

*In re Aéropostale, Inc.*,
  555 B.R. 369 (Bankr. S.D.N.Y. 2016) ...........................................................13, 17

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*,
  910 A.2d 1020 (Del. Ch. 2006)......................................................................34, 35

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................9

*In re Atlas Energy Res., LLC*,
  2010 WL 4273122 (Del. Ch. Oct. 28, 2010) .......................................................33

*Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*,
  473 B.R. 525 (Bankr. D. Del. 2012) ..............................................................12, 13

*Bayer Corp. v. Masco Tech, Inc. (In re Autostyle Plastics, Inc).*,
  269 F.3d 726 (6th Cir. 2001) ....................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................9

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)..............................................................................8

*Burtch v. Huston (In re USDigital, Inc.)*,
  443 B.R. 22 (Bankr. D. Del. 2011) .....................................................................20

*In re Cadira Grp. Holdings, LLC Litig.*,
  2021 WL 2912479 (Del. Ch. July 12, 2021).........................................................34

*City of Pittsburgh v. W. Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998)................................................................................6

*Cohen v. KB Mezzanine Fund II, LLP (In re SubMicron Sys. Corp.)*,
  432 F.3d 448 (3d Cir. 2006).............................................................9, 10, 22, 23

*Composecure, L.L.C. v. Cardux, LLC*,
  206 A.3d 807 (Del. 2018) ...................................................................................33

*In re Crucible Materials Corp.*,
    2012 WL 5360945 (Bankr. D. Del. June 11, 2012)...................................................25, 27, 29

*Daewoo Motor America, Inc. v. Daewoo Motor Co. (In re Daewoo Motor Am., Inc.)*,
    471 B.R. 721 (C.D. Cal. 2012) ............................................................................18

*Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*,
    622 A.2d 14 (Del. Ch. 1992) *aff'd*, 609 A.2d 668 (Del. 1992)...............................35

*Dawson v. Pittco Capital Partners, L.P.*,
    2012 WL 1564805 (Del. Ch. Apr. 30, 2012) .........................................................34

*In re Exide Techs., Inc.*, *Techs.*,
    299 B.R. 732 (Bankr. D. Del. 2003) ................................................................ *passim*

*Fisk Ventures, LLC v. Segal*,
    2008 WL 1961156 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) .................34, 35

*Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*,
    452 B.R. 512 (Bankr. D. Del. 2011) .....................................................................10

*Insys Liquidation Trust v. Quinn Emanuel Urquhart & Sullivan, LLP (In re Insys Therapeutics, Inc.)*,
    2021 WL 5016127 (Bankr. D. Del. Oct. 28, 2021) ...........................................25, 26

*In re Lifschultz Fast Freight*,
    132 F.3d 339 (7th Cir. 1997) ................................................................................22

*Mellon Bank N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*,
    92 F.3d 139 (3d Cir.1996)......................................................................................25

*Minn. Corn Processors, Inc. v. Am. Sweeteners, Inc.(In re Am. Sweeteners, Inc.)*,
    248 B.R. 271 (Bankr. E.D. Pa. 2000) ...................................................................32

*New Enter. Assocs. 14, L.P. v. Rich*,
    295 A.3d 520 (Del. Ch. May 2, 2023) ...........................................................34, 35

*Official Comm. of Unsecured Creditors of Fedders North America, Inc v. Goldman Sachs Credit Partners L.P. (In re Fedders North Am., Inc.)*,
    405 B.R. 527 (Bankr. D. Del. 2009) .......................................................................9

*Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation), LLC*,
    590 B.R. 211 (Bankr. D. Del. 2018) ............................................................... *passim*

*Official Comm. of Unsecured Creditors of Moll Indus., Inc. v. Highland Capital Mgmt. L.P. (In re Moll Indus., Inc)*,
454 B.R. 574 (Bankr. D. Del. 2011) .................................................................................. *passim*

*Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*,
353 B.R. 820 (Bankr. D. Del. 2006) ...........................................................................10, 11, 15

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
267 F.3d 340 (3d Cir. 2001)............................................................................................31, 32

*Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*,
444 B.R. 51 (Bankr. D. Del. 2010) ........................................................................................13

*Pension Benefit Guar. Comp. v. White Consol. Indus., Inc.*,
998 F.2d 1192 (3d Cir. 1993)....................................................................................................3

*Pliskin v. Radians Wareham Holdings Inc. (In re ICPW Liquidation Corp.)*,
600 B.R. 640 (Bankr. C.D. Cal. 2019)...................................................................................32

*Redmond v. Jenkins (In re Alternate Fuels)*,
789 F.3d 1139 (10th Cir. 2015) .............................................................................................21

*Roman Cleanser Co. v. Nat'l Acceptance Co. of Am. (In re Roman Cleanser Co.)*,
43 B.R. 940 (Bankr. E.D. Mich. 1984), *aff'd*, 802 F.2d 207 (6th Cir. 1986) .........................30

*Roth Steel Tube Co. v. C.I.R.*,
800 F.2d 625 (6th Cir. 1986) .................................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................................................6

*Terry Oilfield Supply Co. v. Am. Sec. Bank, N.A.*,
195 B.R. 66 (S.D. Tex. 1996) ................................................................................................27

*Trimarchi v. Together Dev. Corp.*,
255 B.R. 606 (D. Mass. 2000) ...............................................................................................29

*U.S. Bank N.A. v. DHL Global Forwarding (In re Evergreen Solar, Inc.)*,
2014 WL 300965 ....................................................................................................................32

*United States v. Noland*,
517 U.S. 535 (1996)...........................................................................................................23, 24

*United States v. State St. Bank & Tr. Co.*,
520 B.R. 29 (Bankr. D. Del. 2014) ..................................................................................12, 13

*Walker v. Pasteur* (*In re Aphton Corp.*),
    423 B.R. 76 (Bankr. D. Del. 2010) ........................................................................25

*Walnut Creek Mining Co. v. Cascade Inv., LLC ( In re Optim Energy)*,
    527 B.R. 169 (D. Del. 2015) ..........................................................................20, 21

*Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*),
    544 B.R. 75 (Bankr. S.D.N.Y. 2016) ............................................................ *passim*

**Statutes**

6 Del. C. § 18-1101(c) ........................................................................................33

11 U.S.C. § 506 ..................................................................................................24

11 U.S.C. § 549(a) ........................................................................................26, 27

11 U.S.C. § 544(b) ..............................................................................................29

11 U.S.C. § 547(b) ..............................................................................................27

N.Y. U.C.C. Law § 9-102(64)(A) ......................................................................28

N.Y. U.C.C. Law § 9-104 ...................................................................................28

N.Y. U.C.C. Law § 9-315(a)(2) ..........................................................................28

N.Y. U.C.C. Law § 9-315(c) ..............................................................................28

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ...............................................................................1, 9, 10

Fed. R. Bankr. P. 7012(b) .....................................................................................1

## NATURE AND STATE OF PROCEEDINGS

The Official Committee of Unsecured Creditors (the "Committee") filed an Adversary Complaint (the "Complaint") in the above-captioned proceeding on June 9, 2023. ECF 1. Defendants Barings Asset-Based Income Fund (US), L.P., BABIF Gigablocker LLC, Matthew Sandoval, W.F. (Rooney) deButts, and Julie Niedzwiecki (collectively, the "Barings Defendants") respectfully submit this memorandum of law, along with the Declaration of Erin N. Brady dated July 24, 2023 (the "Brady Declaration"), in support of their motion to dismiss the Complaint in its entirety (the "Motion") pursuant to Fed. R. Civ. P. 12(b)(6), which is made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012(b).[2]

## SUMMARY OF ARGUMENT

The Complaint asserts six causes of action against Barings for: (1) recharacterization of debt as equity (Count I); (2) equitable subordination (Count II); (3) avoidance and recovery of pre-petition legal fees (Count III); (4) avoidance and recovery of post-petition legal fees (Count IV); (5) avoidance and recovery of a security interest transfer (Count V); and (6) declaratory judgment (Count VI). The final cause of action, Count VII, is against the Individual Defendants and Mr. Reddy for alleged breach of various duties. Each of the claims in the Complaint is deficient as a matter of law, and therefore must be dismissed.

The Committee likely will argue that it has met the applicable pleading requirements, and that it should be given an opportunity to flesh out its bare claims in discovery. The Court should be aware, however, that well before the Complaint was filed, the Barings Defendants voluntarily produced over twenty thousand pages of documents to the Committee. Brady Decl. ¶ 4. Thus, the

---

[2]      The undersigned counsel represent the five defendants that are identified above as the Barings Defendants. The sixth defendant, Nisanth Reddy, has not yet been served with the Complaint. We will refer to the two corporate defendants collectively as "Barings" and the three individual defendants represented by the undersigned as the "Individual Defendants." All other capitalized terms that are not defined below shall have the same meaning as in the Complaint.

Committee has already combed through the Barings Defendants' files but remains unable to articulate claims supported by the facts.

The facts described in this brief are undisputed because they come from the Complaint itself or the relevant documents.[3] And these undisputed facts show that the Committee cannot prevail on its various causes of action against Barings. The claim for recharacterization in Count I fails because all of the relevant factors in the well-established, multiple-prong test weigh against the Committee's claim or, at worse, are neutral. Count II fares no better. There can be no equitable subordination here because (i) the Barings Defendants did not act inequitably; (ii) the creditors suffered no injury as a result of the Barings Defendants' actions; and (iii) subordination would be inconsistent with the Bankruptcy Code. With regard to the avoidance claims in Counts III and IV, the Committee does not support its conclusory allegations regarding the pre-petition legal fees with any facts, and the claim to avoid the post-petition legal fees falls short because the payments were made pursuant to this Court's order. Count V (for avoidance of a security interest transfer) fails to state a cognizable claim because Barings did not receive more as a result of the alleged transfer than it would have if the transfer had not been made. Finally, Count VI should be dismissed because it is based on a faulty legal premise.

The one set of claims against the Individual Defendants (Count VII) suffers from equally fatal flaws. As an initial matter, the Committee lacks standing to bring those claims because they were released by the Debtors. Moreover, the claims are barred by the relevant operating agreement, which expressly eliminates any duties for the Individual Defendants.

---

[3] The Committee does not attach any documents to the Complaint, including the numerous documents that it purports to describe in its allegations. It is evident that the Committee has cherry-picked certain facts for the Complaint while omitting other crucial details, thereby providing a distorted view of the facts. The Barings Defendants have provided the relevant documents to the Court (as it may on a motion to dismiss) as exhibits to the Brady Declaration. Unless otherwise indicated herein, all citations to "Ex." are citations to exhibits attached to the Brady Declaration.

In light of the foregoing, as set forth in more detail in the following pages, the Barings Defendants urge the Court to dismiss the Complaint in its entirety and with prejudice.

## STATEMENT OF RELEVANT FACTS[4]

### I.    Barings' Acquisition in November 2019

As alleged in the Complaint, Barings became involved with the Debtors in November 2019, when it acquired 65,000,000 preferred units of GigaSphere Holdings at a price of $1.00 per share ("Barings Units"). Compl. ¶ 22. Barings' Units represented an approximately 54% majority interest in GigaSphere Holdings. *Id.* ¶ 24.

### II.    The LLCA Addresses the Investors' Rights to Provide Debt and Equity to GigaSphere Holdings and Subsidiaries

Concurrently with Barings' investment, GigaSphere Holdings amended and restated its limited liability company agreement (the "LLCA"). *Id.* ¶ 22. Several provisions of the LLCA— particularly those governing the issuance of new equity and debt—are relevant to the Motion. We describe those provisions in the paragraphs that follow.

#### A.    Board Composition and Governance

The Complaint generally describes the Board and the authority of the Barings Managers, *see id.* ¶¶ 25-32, but it omits certain rights held by the "Non-Barings Representative," which the LLCA defines as "Rick Neuman or such other individual as may be from time to time designated to the Board in writing by a Non-Barings Majority Interest." [5] Ex. 1, Sched. 1.1. Most importantly,

---

[4]    Facts relevant to this Motion are drawn from the factual allegations in the Complaint (which the Barings Defendants accept as true for purposes of this Motion only), and the documents referenced in the Complaint. *See, e.g., Pension Benefit Guar. Comp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (court can consider documents referenced in the complaint on motion to dismiss); *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.*, Techs.), 299 B.R. 732, 740 (Bankr. D. Del. 2003) (same). Any other grounds for the Court's consideration of documents are discussed below when the document is referenced.

[5]    The "Non-Barings Majority Interest," in turn, is defined as "Members who are not Barings Investors and who hold a majority of the Preferred Units held by the Members (excluding those Preferred Units held by the Barings Investors)." *Id.*

3

the Non-Barings Representative has the right to veto, among other things, any action that would waive the preemptive rights granted under the LLCA. *Id.*, § 5.1(e)(A).

B. **Provisions Protective of Preferred Shareholders: Preemptive Rights and Member Loan Protections**

The LLCA is strongly protective of GigaSphere Holdings' preferred shareholders, containing (at least) two anti-dilution protections relevant to this litigation. The first of these provisions provides preferred shareholders—"Preemptive Rights Holders"—preemptive rights in the event of any subsequent equity issuance. Specifically, the LLCA provides that if "the Board authorizes the offer and sale, or issuance, of any Equity Securities of the Company or any of its Subsidiaries to any Person" (regardless of whether that person or entity is a Member or otherwise an insider), then "the Company or its Subsidiary, as applicable, shall offer to sell or issue to each Preemptive Rights Holder a portion of such Offered Securities" in accordance with a formula set forth therein. *Id.*, § 3.4(a). In addition to providing preemptive rights, the LLCA also prevents share dilution by mandating that "Loans by Members or Unitholders to the Company ***shall not be considered Capital Contributions***." *Id.*, § 3.8 (emphasis added). Specifically, the agreement provides that to the extent any member or unit holder "loans any funds to the Company in excess of the amount [it was] required to . . . contribute[] to the capital of Company," the funds advanced shall not increase that entity's capital account but, rather, "shall be a debt of the Company to such Member or Unitholder, and ***shall be payable or collectible in accordance with the terms and conditions upon which such loans are made***." *Id.* (emphasis added).

From these provisions, it is clear that (1) no party could receive equity in GigaSphere Holdings or any of its subsidiaries without GigaSphere Holdings (or its subsidiary) providing GigaSphere Holdings' preemptive rights holders with the opportunity to similarly invest; and (2)

any amounts a Member or Unitholder provided to the Company in excess of its required capital contribution was, by definition, a loan and could not serve to increase that entity's capital account.

## III.   Barings Makes a Loan to GigaSphere Holdings' Subsidiary, GigaMonster Networks

In or about October 2020, Barings was asked to extend a $7.5 million loan to GigaMonster Networks, a subsidiary of GigaSphere Holdings (the "Loan Agreement"). *See* Ex. 2. Barings agreed, subject to the terms and conditions set forth in the Loan Agreement. *See* Ex. 3.

After consideration and approval by the Board, Barings and GigaMonster Networks entered into the Loan Agreement. *Id.* The 30-page Loan Agreement contains terms and conditions customary of comparable corporate loan agreements. *See* Ex. 2. It has both a stated maturity date (October 23, 2021) and a fixed rate of interest (12% per annum),[6] provides for default interest (existing interest rate, plus 2% per annum), requires quarterly interest payments (structured with a customary PIK toggle), and provides Barings with security for the advances (a lien on substantially all of the Debtors' assets, including proceeds of collateral). *See id.* §§ 1.01 2.05(a), 9.01. It also establishes a collateral agent, contains standard default provisions (including cross-default provisions) and covenants (including negative and financial covenants), and provides for a payment waterfall upon default (which did not contemplate or permit subordination of Barings' payment rights to any other entity). *See id.* §§ 1.01, 8.01, 8.03, Art. VI, VIII, X. GigaMonster Network's obligations under the Loan Agreement are unconditionally guaranteed by several of its affiliates, including GigaSphere Holdings. *Id.* § 9.07.

The incurrence of debt contemplated by the Loan Agreement was approved by the Board upon a determination that (1) the "financing to be provided pursuant to the Loan Agreement will provide direct and indirect financial benefits to the Company and affiliates thereof;" and (2)

---

[6]   The Tranche B loan put in place as part of the sixth amendment to the Loan Agreement established a fixed 14 percent interest rate.

although the loan transaction may have been an Interested Transaction (as defined in the LLCA), the Loan Agreement was "on arm's length and [had] a reasonable business purpose." *See* Ex. 3. All of the non-interested directors voted to approve the Loan Agreement and the transactions contemplated therein. *Id.* Critically, the Board did not offer to sell or issue to preemptive rights holders a portion of the debt to be issued by Barings, as would have been required had Barings' loan been equity. *Id.* This was true even though Board member William Dodd was a Manager of GigaMonster, LLC, an entity entitled to exercise preemptive rights under the LLCA. *See* Ex. 1, Sched. 3.2 (listing preferred shareholders), Ex. 4.[7]

Over the next 24 months, GigaMonster Networks requested—and Barings provided—additional debt financing intended to provide the Debtors with breathing room to pursue a variety of transactions, including an equity raise, turnaround or the sale of all or part of the company as a going concern.[8] These additional funds, all of which were used to fund general operations, were provided by virtue of the various amendments to the Loan Agreements (each an "Amendment," collectively, the "Amendments," and together with the Loan Agreement and documents in furtherance thereof, the "Loan Documents"), which are described in the Complaint. *See* Compl. ¶¶ 52-84, 91-96.) Except as shown in Exhibit 11 to the Brady Declaration, the Amendments did not change the key terms of the Loan Agreement. *See* Ex. 11, *see also* Ex. 5 – 10.

Like the Loan Agreement, (1) each Amendment was duly approved by all of the disinterested directors upon a determination that the financing, which was at arms' length, had a reasonable business purpose and would benefit the Company and its affiliates and (2) GigaSphere

[7]     On a motion to dismiss, courts may consider matters of which it may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Among other things, a court may take judicial notice of public records. *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 259 (3d Cir. 1998). The Court, therefore, may take Ex. 4 to the Brady Declaration into account when deciding the Motion.
[8]     While the Committee does not so allege in its Complaint, it is certainly aware — by virtue of the tens of thousands of pages of discovery Barings voluntarily produced to the Committee before the institution of this litigation — that the Debtors were in an active fundraising process throughout much of this period.

6

Holdings did not provide Preemptive Rights Holders with an opportunity to exercise preemptive rights—as would have been required had Barings' loan been equity. *See* Ex. 12.

## IV.    **GigaSphere Holdings Forms a Restructuring Committee and Barings Waives its Majority Interest Rights**

By September 2022, GigaSphere Holdings and its subsidiaries were "experiencing certain financial challenges and [were] considering a variety of potential restructuring alternatives." Ex. 13, Art. II. To face these challenges, the Board—then made up of the Barings Managers and GigaSphere Holdings' CEO, Doug Macgill—appointed Michael T. Sullivan, an independent manager with restructuring experience, to guide the company through a restructuring process. Concurrently with this appointment, the Board formed a restructuring committee to be comprised solely of Messrs. Macgill and Sullivan (the "Restructuring Committee"), which committee was delegated authority to "make any and all decisions deemed necessary and advisable by the Restructuring Committee," in connection with the restructuring of the company, including the authority to approve asset sales, undertake additional financing or file an insolvency proceeding. *Id.* And to ensure that the Restructuring Committee had sole authority to manage the ensuing restructuring process, Barings also waived certain of its consent rights as the Majority Interest (as defined in the LLCA) for a period of 90-days. *Id.* Art. III. As a result of these transactions (and contrary to the allegations in the Complaint), the Barings Managers no longer actively participated in the management of the Debtors' affairs after September 22, 2022.

## V.    **The Forbearance Agreement**

By the time the Restructuring Committee was formed, GigaMonster Networks had triggered several events of default under the Loan Agreement, including granting a purchase money security interest covering inventory in violation of section 8.01(b) of the Loan Agreement. *See* Ex. 14, § 1(b)(i). On September 27, 2022, Barings and the Debtors entered into the Forbearance

Agreement, through which Barings agreed not to exercise available rights and remedies with respect to existing or future events of default until the earlier of October 31, 2022, or a "forbearance termination event," as defined in the Forbearance Agreement. *See* Compl. ¶ 86; Ex. 14 § 2(d). As consideration for the forbearance, each of GigaMonster Networks and its guarantor subsidiaries (1) ratified the Loan Agreement (as amended) and the liens granted thereby and (2) provided Barings and, among others, its employees (including the Individual Defendants) with an express and broad release of liability and covenant not to sue on account of any claims arising out of or relating to their "Obligations, the Loan Documents [both as defined therein], the [Forbearance Agreement] and/or the transactions contemplated thereby." *Id*. §§ 7(b), 8.

## VI.    **The Second Forbearance Agreement and Consent**

In early November 2022, the Restructuring Committee decided to sell certain of the Debtors' assets outside of the ordinary course of business. The Loan Agreement, however, required GigaMonster Networks to use the proceeds of such a sale to repay its obligations under the Loan Agreement. *See* Ex. 2, § 2.02(b)(ii). The Debtors—wanting to use the sale proceeds to fund operating expenses pending a sale or sales of additional assets—asked Barings to waive this requirement, which it did through another forbearance agreement (the "Second Forbearance Agreement"). *See* Ex. 15, §1.[9] The Second Forbearance Agreement provided that (1) Barings' existing liens on the assets would continue to extend to the sale proceeds, as required under section 9.01 of the Loan Agreement and (2) the sale proceeds would be placed into a bank account

---

[9]      The Court may consider the Second Forbearance Agreement in connection with the Motion because it (1) directly relates to the allegations in the Complaint regarding the establishment of the Deposit Account Control Agreement ("DACA"), *see* Compl. ¶ 97, (2) is part of the Loan Documents, and (3) is integral to the claims made by the Committee. *See, e.g., In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (court deciding a motion to dismiss may consider documents integral to the complaint). By the Second Forbearance Agreement, Barings also extended the forbearance termination date through November 30, 2022.

governed a deposit account control agreement. *Id.* § 2. The Second Forbearance Agreement also provided Barings and its related parties with a broad release. *See id.* §§ 2, 14.

## STANDARD FOR A RULE 12(B)(6) MOTION TO DISMISS

In deciding a motion to dismiss, a court must only accept as true well-plead factual allegations that nudge a plaintiff's claims across the line from conceivable to plausible, and a complaint without such allegations is subject to dismissal. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 561-63, 570 (2007). Plaintiffs cannot state a valid claim simply by offering "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Official Comm. of Unsecured Creditors of Moll Indus., Inc. v. Highland Capital Mgmt. L.P. (In re Moll Indus., Inc).,* 454 B.R. 574, 581 (Bankr. D. Del. 2011) (adopting *Iqbal* standard in context of motion to dismiss claim for recharacterization and equitable subordination).

## ARGUMENT

### I.   The Committee Has Failed to State a Claim for Recharacterization

The Committee's recharacterization claim should be dismissed because the Complaint fails to allege facts that give rise to a plausible claim that Barings and the Debtors intended for the Loans to be disguised equity contributions.

In the Third Circuit, the overarching inquiry for a recharacterization claim is intent, *i.e.*, "'whether the parties to the transaction in question intended the loan to be a disguised equity contribution.'" *Official Comm. of Unsecured Creditors of Fedders North America, Inc v. Goldman Sachs Credit Partners L.P.* (*In re Fedders North Am., Inc.*), 405 B.R. 527, 554 (Bankr. D. Del. 2009). This intent is "inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances . . . no mechanic scorecard suffices." *Cohen v. KB Mezzanine Fund II, LLP* (*In re SubMicron Sys. Corp.*),

432 F.3d 448, 456 (3d Cir. 2006); *see also Official Comm. of Unsecured Creditors of Radnor Holdings Corp. v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 838 (Bankr. D. Del. 2006) (rejecting mechanistic approach to recharacterization claim in favor of "*common sense* evaluation of the circumstances surrounding a transaction.") (emphasis in original). Moreover, the relevant intent of the parties is "as it existed at the time of the transaction." *SubMicron*, 432 F.3d at 457.

Recognizing that intent is "determined not by applying any specific factor, but through a common-sense evaluation of the facts and circumstances surrounding a transaction*," Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512 (Bankr. D. Del. 2011), courts in the Third Circuit consider eleven non-determinative factors to help evaluate the intent of the parties in the context of a recharacterization claim:

> (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or inadequacy of capitalization; (vi) the identity of interest between the creditor and the stockholder; (vii) the security, if any for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets and (xi) the presence or absence of a sinking fund to provide repayments.

*Exide*, 299 B.R. at 740 (citing *Bayer Corp. v. Masco Tech, Inc. (In re Autostyle Plastics, Inc).*, 269 F.3d 726, 750–53 (6th Cir. 2001)) (adopting eleven-factor test set forth in *Roth Steel Tube Co. v. C.I.R.,* 800 F.2d 625, 630–32 (6th Cir. 1986)). Where application of these factors, on the whole, weighs against recharacterization of debt as equity, dismissal of the claim under Rule 12(b)(6) is proper. *See, e.g., Exide*, 299 B.R. at 740-42; *Moll*, 454 B.R. at 581-85; *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.),* 544 B.R. 75, 94 (Bankr. S.D.N.Y. 2016) ("On a motion to dismiss, a

complaint would have to plead facts to trigger the applicability of the *AutoStyle* factors or their equivalent, or a meaningful subset of them to avoid dismissal.") (citation and quotation omitted).

The Committee's recharacterization allegations consist of a few discrete, non-dispositive facts taken out of context in an attempt to misconstrue and obscure the parties' intent and actions. A "common sense" evaluation of the transactions plainly evidences that the parties' intent was that the loans be treated as debt. *See Radnor*, 353 B.R. at 838.

### A.    <u>Names Given to the Instruments</u>

Courts have found that "[t]he absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans." *Autostyle*, 269 F.3d at 750 (citation omitted). Here, however, the operative agreements are unquestionably "instruments of indebtedness," including the 30-page "Loan & Security Agreement," the Amendments, the Forbearance Agreement and the Second Forbearance Agreement. *See* Exs. 2, 5-10, 14, 15. This undisputed factor weighs strongly against recharacterization.

### B.    <u>Fixed Maturity Date, Interest Rate and Repayment Terms</u>

Courts uniformly hold that the inclusion of a fixed maturity date, interest rate and repayment terms support characterizing an agreement as debt. *See, e.g.*, *Exide*, 299 B.R. at 741; *Moll*, 454 B.R. at 582; *Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation), LLC*, 590 B.R. 211, 292 (Bankr. D. Del. 2018). The Loan Agreement—and each Amendment—contains a fixed maturity date, a fixed interest rate, and fixed repayment terms. *See* Ex. 2, §§ 1.01, 2.04, 2.05. The Committee concedes this point, as it must. *See* Compl. ¶ 106 (noting that "on [their] face the Loan Agreements provided for a fixed maturity, interest rate and interest payments").

The Committee alleges, however, that these provisions are "illusory." *Id.* Specifically, the Committee alleges that the Loan Agreements' fixed maturity date is "illusory" because "[t]he

maturity date was extended three times, as desired by or necessary for the Debtors to avoid default." *Id.* But courts have repeatedly found that a lender's decision to extend a loan agreement's fixed maturity date—even if the extension was intended solely to avoid the borrower's default— does not weigh in favor of recharacterization. *See United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 76 (Bankr. D. Del. 2014) (recognizing that lenders will often extend maturity dates as a company encounters financial distress to avoid forcing a liquidation and to maximize their likelihood of repayment).[10] And it bears noting that Barings extended the maturity date only in connection with Amendments (and then only with respect to three of the six Amendments). *See* Ex. 11.

The Committee also alleges that the Loan Agreement's fixed interest rate and repayment terms are illusory because "cash interest and principal payments were never made to or demanded by Barings." Compl. ¶ 106. To be clear, the Loan Agreement did not require—and Barings did not have the right to demand—that GigaMonster Networks make cash interest or principal payments during the term of the Loan. Instead, the Loan Agreement required that (1) principal be repaid on the maturity date (or upon a mandatory prepayment event) and (2) cash or, at the Debtors' election, PIK interest be paid at a rate of 12 percent per annum (14 percent per annum for Tranche B lending), due on the last business day of each quarter (or, in the event of a PIK election, capitalized quarterly and payable on maturity). Exs. 2, 5-10, § 2.05(a), Ex.10, § 2.05(b). Indeed, GigaMonster Networks made a PIK election and capitalized the accrued interest as required under the Loan

---

[10]    While some courts have found that maturity date extensions support a claim for recharacterization, those courts have done so largely in situations where loans were rolled up upon maturity or parties simply ignored the maturity date altogether. *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 573 (Bankr. D. Del. 2012*)* (finding that maturity date was illusory when repayment dates were ignored, or loans were rolled up each time principal payments came due). Here, there is no allegation that the maturity date ever occurred.

Documents, which is a common, market-driven option for borrowers. *See generally* Exs. 5-10 (reciting loan balances that included accrued and capitalized PIK interest).[11]

Collectively, therefore, these factors weigh strongly against recharacterization.

### C.    The Source of Repayments

While courts opine that "[i]f the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution," they also recognize that "[a]ll extensions of credit depend on a company's success, and that risk alone—without more—does not indicate that they are capital contributions." *Autostyle*, 269 F.3d at 751 (citation omitted); *State St. Bank*, 520 B.R. at 76. Critically, courts are clear that loans secured by collateral are, by definition, not dependent solely on the success of the debtor's business, as the lender could foreclose upon the borrowers' assets even upon its failure. *See, e.g., In re Aéropostale, Inc.*, 555 B.R. 369, 421 (Bankr. S.D.N.Y. 2016); *AutoStyle*, 269 F.3d at 751; *but, see Autobacs*, 473 B.R at 575-76 (recharacterizing unsecured loans where repayment was solely dependent on the debtor's success).

The Committee alleges that because "the Debtors made no cash payments to Barings and have filed these chapter 11 cases . . . it is plainly obvious that repayment of the Loans depended on the success of the Debtors." Compl. ¶ 108. This allegation is wholly irrelevant to whether the parties' expectation of repayment depended solely on the success of the borrower's business.

---

[11]    The Committee may argue that the parties' agreement to allow PIK interest evidences that the Loan Agreement was a disguised equity contribution. This argument, however, would be unfounded, as courts have repeatedly held that an agreement deferring payment of interest rates does not, by itself, "mean that the parties converted a debt transaction to equity since the defendants still expected to be repaid." *HH Liquidation*, 590 B.R. 211 at 293 (citing *Autostyle*, 269 F.3d at 751); *Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC)*, 444 B.R. 51, 96 (Bankr. D. Del. 2010) (the "presence of PIK interest is not decisive" of the recharacterization analysis "especially in a distressed investment context"); *State St. Bank,* 520 B.R. at 79 ("The Junior PIK Notes reflect all indicia of indebtedness, including the issuance of notes with payment at a fixed interest rate (although payment of interest was deferred).").

Indeed, if a debtor's failure to repay a loan before filing chapter 11 was a basis for loan recharacterization, nearly every prepetition lender's loan would be subject to this result.

In any event, once again, the plain terms of the Loan Agreement support characterizing the loan as debt. The Loan was secured, and as such, its repayment was not dependent solely on the success of GigaMonster Networks' business. Ex. 2, §§ 9.01, 9.03. Moreover, Barings had an enforcement right upon default *Id.* § 8.02., and GigaMonster Networks' requirement to repay the Loan upon maturity was absolute, regardless of whether it was successful. *Id*. § 2.04. Accordingly, this factor also weighs heavily against recharacterization.

### D.     Undercapitalization

Courts consistently find that "whether [a debtor was] undercapitalized at the time of a transaction, though relevant, is not determinative" of the intent of the parties. *Exide*, 299 B.R. at 741 (quoting *Farr v. In re Phase I Molecular Toxicology, Inc. (In re Phase I Molecular Toxicology, Inc.)*, 287 B.R. 571, 578 (D.N.M. 2002)). The undercapitalization analysis is particularly relevant when "a corporation is started by the shareholders with a minimal amount of capital who then make a large loan of money to the newly formed corporation." *Autostyle,* 269 F.3d at 751 (citation omitted).

Here, the Committee alleges that the Debtors were "inadequately capitalized" because, at the time of each borrowing, they were "estimating a negative EBITDA and negative gross revenue for the foreseeable future." Compl. ¶ 109. It further alleges that Barings kept "pil[ing] money into the Debtors even when previous installments failed to improve the Debtors' financial condition" and that it "knew when it made each of the Loans that the capital infused would only permit the Debtors to continue to operate for a couple more months at a time." *Id*. These allegations—even if true—fail to establish that the Debtors were undercapitalized.

14

As an initial matter, the Debtors did not project "negative gross revenue"—the Loan Agreement's Gross Revenue covenant projected positive gross revenue throughout the term of the Loans. Exs. 2, 5-10 § 7.02. That aside, the Committee's conclusory allegations ignore that (1) the Debtors were formed and capitalized with more than $117 million in November 2019, $65 million of which was contributed—in cash—by Barings, Compl. ¶ 22; Ex. 1, Sched. 3.2; (2) the loans were provided in the midst of a global pandemic; (3) the Debtors had no funded debt prior to the Loan Agreement, Ex. 2, Sched. 6.02; and (4) the Debtors' first advance under the Loan Agreement was $7,500,000, amounting to a 1:8.6 (or 0.12) debt-to-equity ratio. *Id.* § 2.01, Ex. 1, Sched. 3.2. These undisputed facts fatally undermine the notion that the Debtors' alleged undercapitalization evinces Barings' intent to make an equity investment.

That Barings made subsequent advances to the Debtors does not change this result. Once Barings extended its first loan—thereby becoming a lender—its subsequent advances are viewed under a different standard.[12] Indeed, the undercapitalization of a debtor "has limited weight where an 'existing lender . . . extend[s] additional credit to a distressed borrower as a means to protect its existing loans.'" *HH Liquidation*, 590 B.R. at 293–94 (quoting *Radnor*, 353 B.R. at 839). Moreover, it "is legitimate for the lender to take actions to protect existing loans, including extending additional credit or granting forbearance." *Moll*, 454 B.R. at 583-84 (holding secured lender's decisions to not declare default, to ease loan terms, and write down debt "do not support recharacterization"). Finally, a lender's knowledge that a debtor is facing a liquidity crisis at the time the loan was made is "insufficient to support recharacterization." *Radnor*, 353 B.R. at 839.

---

[12]    Some courts, in fact, have reasoned that this same "preexisting lender" standard should be applied to any party with a preexisting relationship with a borrower, including an equity holder. *See, e.g., Lyondell*, 544 B.R. at 99 (recognizing that equity holders and lenders have similar interests in protecting their preexisting investments, which interests are relevant to intent in a recharacterization analysis).

This factor, therefore, weighs against recharacterization. But even if it were neutral or weighed in favor of recharacterization, this factor is not dispositive of, and is given little weight in ascertaining, the parties' intent. *HH Liquidation,* 590 B.R. at 294 (limited weight should be given to undercapitalization where parties have a preexisting relationship).

     **E.**    <u>**Identity of Interest**</u>

    "'If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated,' while 'a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt.'" *Lyondell,* 544 B.R. at 98 (quoting *Autostyle*, 269 F.3d at 751); *HH Liquidation*, 590 B.R. at 294 (if a stockholder makes advances "in proportion to their respective stock ownership, an equity contribution is indicated") (citation and internal quotations omitted). This factor "applies most obviously when several stockholders extend . . . funds, and one can measure the proportion of the contribution of each against the stock ownership of each." *Lyondell*, 544 B.R. at 98.

    Here, however, the funds at issue came from a single source, Barings. Despite the fact that Barings held only a 53 percent interest in GigaSphere Holdings, it held a (sharply disproportionate) 100 percent interest in the Loans. Compl. ¶ 38. None of the other equity-holders—holding 47 percent of GigaSphere Holdings' equity—participated. Moreover, while Barings held equity in GigaSphere Holdings, its loans were made to GigaMonster Networks, an entirely different entity.

    Without facts to satisfy this factor, the Committee attempts to muddy it—blurring the lines between equitable subordination and recharacterization. The Committee alleges that "the identity of interests between the Debtors and Barings is evident by the complete control Barings has over the Debtors pursuant to the Units Purchase Agreement and LLCA which allow Barings, among other things, to appoint the majority of the Board and dictate all material business decisions,

including all financial decisions." Compl. ¶ 107. But again, these facts are irrelevant. Control is not the issue when assessing the identity of interests.

Thus, the "identity of interest" factor weighs heavily against recharacterization.

### F.    The Security Provided for the Advances

"[R]echaracterization is an unusual remedy where an advance is secured." *HH Liquidation*, 590 B.R. at 289; *see also Aéropostale*, 555 B.R. at 422 (finding lien on substantially all of the debtors' assets weighed against recharacterization). And here the obligations under the Loan Agreement are indisputably secured and perfected. This factor, therefore, weighs heavily against recharacterization.

### G.    Ability of Debtor to Obtain Outside Financing

"'Where no reasonable creditor would have acted in the same manner' it is 'evidence that the advances were capital contributions rather than loans.'" *HH Liquidation*, 590 B.R. at 295 (quoting *AutoStyle*, 269 F.3d at 752). This factor looks at whether a "reasonable outside lender would have made a loan to the debtor on similar terms." *Lyondell,* 544 B.R. at 99 (citation omitted).

The Committee baldly alleges that the Debtors' "significantly impaired financial condition prevented their ability to obtain outside financing from a third-party source, particularly on the same terms and conditions as the Loans." Compl. ¶ 111. This conclusory allegation—and the Complaint overall—is devoid of any facts that actually address whether a "***reasonable outside creditor*** would have made a [***similar***] ***loan***," *i.e.*, whether third parties were interested in providing financing or any such capital was (or was not) available on the same terms and conditions as the Loans. *Lyondell,* 544 B.R. at 99 (emphasis added); *see also Moll*, 454 B.R. at 587 (finding the unavailability of alternative financing insufficient to support recharacterization where challenged loans were made by preexisting lender). The Committee's unsupported allegation—especially

when made after the Committee received informal discovery from Barings (and, likely, the Debtors) on the foregoing issues—cannot pass muster.

The Committee also alleges that the Debtors did not seek to refinance the loans "since the same individuals that controlled the Debtors controlled Barings, which allowed Barings to do whatever was in its own best interest, to the prejudice of the Debtors' general unsecured creditors." Compl. ¶ 111. This allegation is wholly irrelevant to the inquiry, which is whether a ***reasonable creditor*** would have made a similar loan on similar terms. *See Daewoo Motor America, Inc. v. Daewoo Motor Co. (In re Daewoo Motor Am., Inc*.), 471 B.R. 721, 738 (C.D. Cal. 2012), *aff'd*, 554 F. App'x 638 (9th Cir. 2014) (recognizing that recharacterization analysis "does not entail a determination of whether treating the transaction as debt is fair or equitable").

Accordingly, the "outside financing" factor weighs against recharacterization.

### Subordination of Advances to Outside Creditors

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans." *Exide*, 299 B.R. at 742 (quoting *Autostyle*, 269 F.3d at 752). It is undisputed that Barings holds a validly perfected, continuing, first-priority senior secured lien on all of the Debtors' property. Thus, this factor heavily weighs against recharacterization.

### H.    Advances Used to Acquire Capital Assets

The fact that advances are "used to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness." *HH Liquidation*, 590 B.R. at 295–96 (quoting *AutoStyle*, 269 F.3d at 752); *Moll*, 454 B.R. at 584. The Committee concedes that Debtors used the "capital infused through the Loans to finance operations (i.e., not to acquire capital assets)." Compl. ¶112. As such, this factor weighs heavily against recharacterization.

### I.    The Presence or Absence of a Sinking Fund

While the presence or absence of a sinking fund can be a relevant consideration in a recharacterization analysis, courts have recognized that where a loan is secured, the "need for any sinking fund" is "obviated," and this factor will carry no weight. *See Exide*, 299 B.R. at 742 (holding the presence or absence of a sinking fund is insignificant where loans are fully secured); *HH Liquidation*, 590 B.R. at 296 (finding that the loans were secured thereby "obviating any need for a sinking fund and rendering this factor irrelevant"). As the debt provided under the Loan Agreement was indisputably fully secured, this factor is not relevant

### J.    Barings Was Prohibited From Investing Additional Capital as Equity

While not an enumerated *Autostyle* factor, the fact that the LLCA prohibited Barings' loans from being treated as equity also weighs heavily in favor of a finding that the Loans were debt. *See HH Liquidation*, 590 B.R. at 296 (considering additional, non-*AutoStyle* factors in recharacterization analysis); *Lyondell*, 544 B.R. at 102 (courts should look to other "indica of intent" where relevant). The LLCA is clear that "Loans by Members or Unitholders to the Company ***shall not be considered Capital Contributions***," and that any amounts a Member contributes to the Company in excess of the amount it was required to contribute to the Company "***shall be payable or collectible in accordance with the terms and conditions upon which such loans are made***." Ex. 1, § 3.8 (emphasis added). The LLCA is equally clear that no party could make an equity investment without GigaSphere Holdings allowing preemptive rights holders to participate. *See id.* § 3.4(a). And while the Committee may argue that these provisions are irrelevant in light of Barings' Board control (or, perhaps, that the debt transactions were a ruse to avoid triggering preemptive rights), the Loan transactions were approved by all of the Company's disinterested Board members—at least one of whom was the manager of a of preemptive rights holder—and the Non-Barings Representative had an independent right to veto any action that

would have waived the preemptive rights granted under the LLCA. *See supra* 4. Under these undisputed facts, one cannot conclude that the parties intended to treat the Barings loans as equity.

\* \* \*

An application of the *Autostyle* and other factors to the undisputed facts (which are drawn from the allegations in the Complaint and related documents) conclusively demonstrates that the Barings advances were loans, not a capital contribution. The Court, therefore, should dismiss the Committee's claims for recharacterization.

## II.    The Committee has Failed to State a Claim for Equitable Subordination

The Committee's claim for equitable subordination should be dismissed as the Committee fails to allege sufficient facts to show Barings engaged in inequitable conduct or caused harm to the unsecured creditors. Equitable subordination is an "extraordinary remedy which is applied sparingly." *HH Liquidation*, 590 B.R. at 298 (citation omitted). To adequately plead a claim for equitable subordination, the Third Circuit requires the Committee to plausibly show that "'(1) the claimant engaged in some type of inequitable conduct, (2) the misconduct . . . resulted in injury to the creditors or conferred an unfair advantage on the claimant, and (3) equitable subordination of the claim is not inconsistent with the provisions of the bankruptcy code.'" *Walnut Creek Mining Co. v. Cascade Inv., LLC (In re Optim Energy),* 527 B.R. 169, 175-76 (D. Del. 2015) (quoting *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986–87 (3rd Cir.1998)).

There are three generally recognized categories of misconduct that may "constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 50 (Bankr. D. Del. 2011). "While the burden of proof on the movant 'is less demanding when the respondent is an insider,' it is axiomatic that

'[i]nsider status alone . . . is insufficient to warrant subordination.'" *HH Liquidation*, 590 B.R. at 298 (internal citations omitted). So, too, "is undercapitalization 'without evidence of deception about the debtors' financial condition or other misconduct." *Id.* (quoting *In re Lifschultz Fast Freight,* 132 F.3d 339, 349 (7th Cir. 1997)); *AutoStyle*, 269 F.3d at 747 (same); *Redmond v. Jenkins (In re Alternate Fuels)*, 789 F.3d 1139, 1155 (10th Cir. 2015) (same). "This makes sense, as '[a]ny other analysis would discourage loans from insiders to companies facing financial difficulty and that would be unfortunate because it is the shareholders who are most likely to have the motivation to salvage a floundering company.'" *HH Liquidation*, 590 B.R. at 298 (quoting *AutoStyle,* 269 F.3d at 747).

Crucially, to constitute inequitable conduct, the insider must have actually used its power to "control the debtor or its position of trust with the debtor to its own advantage or to the other creditors' detriment." *Optim Energy*, 527 B.R. at 177–78 (citation omitted) (explaining that inequitable conduct may be found where an insider seeks to convert existing equity or unsecured debt to senior debt or obtains debt as part of a debt-to-equity conversion scheme).

### A.    The Committee Failed to Plead Facts Plausibly Showing Inequitable Conduct by Barings

The Committee alleges that Barings engaged in inequitable conduct by making secured loans to GigaMonster Networks to protect its equity investment—at a time when it knew the Debtors were struggling financially—because no other lender would do so. Compl. ¶¶ 116-122.

The courts are clear that taking a security interest, without more, does not constitute inequitable conduct. *See Optim Energy*, 527 B.R. at 177 ("It is not inequitable for a lender, even an insider lender, to obtain a lien on the borrower's assets in order to secure its position above creditors in the event of the borrower's default."). This is especially so where, as here, the security interest was taken in conjunction with a loan that generated more than $42 million in additional

liquidity at GigaMonster Networks. *See HH Liquidation*, 590 B.R. at 299 (holding that obtaining a security interest "without more" does not amount to inequitable conduct). The Committee's allegation that the Debtors may have been in financial distress—or even undercapitalized—when Barings made the loans does not change the analysis, particularly where the Committee does not allege that Barings "engaged in any deception about the Debtors' financial condition or other misconduct." *HH Liquidation*, 590 B.R. at 299; *Lifschultz,* 132 F.3d at 345-349 (analyzing impact of undercapitalization on equitable subordination claims). "Courts consistently hold that insider loans to distressed companies will not *ipso facto* be subordinated." *Id.* at 299 (citing *AutoStyle*, 269 F.3d at 747). And, as the *HH Liquidation* court explained, "this is sound policy, as 'the penalty for attempting to save the corporation should not be subordination.'" 590 B.R. at 299 (internal quotations omitted). Because the Committee—in alleging nothing more than that Barings, an insider, made a loan to a financially troubled enterprise—fails to allege that Barings engaged in any inequitable conduct, the equitable subordination claim should be dismissed.

B. **The Committee Fails to Allege Barings' Gain or Creditor Harm as a Result of Barings' Purported Inequitable Conduct**

The Committee also fails to allege facts supporting a conclusion that any alleged Barings' misconduct resulted in injury to other creditors or conferred an unfair advantage to Barings. This element is essential because "the doctrine of equitable subordination is remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of inequitable conduct." *SubMicron*, 432 F.3d at 462 (citation omitted).

The Committee alleges unsecured creditors were harmed because the Loans "pushed unsuspecting general unsecured creditors . . . completely out of the money." Compl. ¶ 122. Far from being injured, however, general unsecured creditors were the primary ***beneficiaries*** of the Loans. The Loans directly resulted in the infusion of $42 million in GigaMonster Networks

22

between October 2020 and November 2022. *See HH Liquidation*, 590 B.R. at 301 (finding no harm to unsecured creditors where loans in question "directly resulted in the infusion of $25 million" in the Debtors). These funds were used to finance operations and, presumably, pay then-existing obligations to the "very same unsecured creditors that the Committee represents." *Id.; see also* Compl. ¶ 112. Far from being harmed, unsecured creditors benefited from this additional working capital. Had the Debtors orchestrated a successful turnaround or sale, unsecured creditors "would have benefitted tremendously from a healthy [entity] that would have been able to pay its creditors." *HH Liquidation*, 590 B.R. at 302; *see also SubMicron*, 432 F.3d at 462 (declining to equitably subordinate loans that allowed the company to continue operating). The Committee's real complaint is not that Barings provided the Loans, but that it stopped doing so.

To that end, by all accounts, Barings ended up in a far worse position as a result of its decision to lend to the Debtors. Barings loaned $42 million in new money to GigaMonster Networks,[13] and it will not recover more than a fraction of that amount.[14] In a case like this, a claim for equitable subordination is particularly untenable.

### C.        Equitable Subordination Would be Contrary to the Bankruptcy Code

A finding of equitable subordination must not be inconsistent with the Bankruptcy Code. *See United States v. Noland*, 517 U.S. 535, 543 (1996) ("[T]he circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Code."). The Committee's request to subordinate Barings' secured debt would be directly contrary to the Bankruptcy Code's provision granting priority to properly

---

[13]        Additionally, upon the Debtors' November 2022 asset sale, Barings allowed GigaMonster Networks to use $3 million of its cash collateral to fund working capital. *See* Ex. 15.

[14]        Barings secured claims in the Debtors' chapter 11 cases exceed $48,876,000 million. *See, e.g.*, Proof of Claim No. 138. As of May 31, 2022, the Debtors were holding only about $17 million in cash and had sold substantially all of their assets. ECF 420 at 2.

perfected secured debt. 11 U.S.C. § 506. For each of the Loans, Barings provided adequate consideration in the form of new money in exchange for its secured status. *See* Exs. 2, 5-10. To upend the priority waterfall in the case would be contrary to the protections Barings bargained for in its exchanges with the Debtors and would unjustifiably disrupt the priority scheme established by Congress in the Bankruptcy Code. *See Noland,* 517 U.S. at 543.

Thus, the Bankruptcy Code provides yet another basis for dismissal of the Committee's equitable subordination claim.

## III.   The Committee Has Failed to State a Claim to Avoid Prepetition Legal Fees as a Fraudulent Transfer

The Committee seeks to avoid as a constructive fraudulent transfer $31,660 of prepetition legal fees that Barings received from the Debtors prior to the Petition Date. *See* Compl. Count III. As the obligation to pay these amounts was indisputably secured and due and owing under the Loan Agreement, the Committee concedes that this claim is only relevant to the extent that its recharacterization or equitable subordination claims prove successful. *See* Compl. ¶ 125. If the Court dismisses the Committee's recharacterization and equitable subordination claims, the Committee concedes its claim for fraudulent transfer of legal fees should be dismissed. *See id.*

But even if the recharacterization or equitable subordination claims do go forward, the Committee's claim for fraudulent transfer must still fail. To state a claim for relief under section 548(a)(1)(B), the Committee must show that the transfer was made for (a) less than reasonably equivalent value; and (b) (i) at a time when the debtor was insolvent, (ii) the debtor became insolvent at as a result of the transaction, (iii) the transfer left it with unreasonably small capital or (iv) the debtor intended or believed it would incur debts beyond its ability to pay.

The Third Circuit has articulated a two-part inquiry for the determination of reasonably equivalent value. The court must first make "an express factual determination as to whether the

debtor received any value at all." *Mellon Bank N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.),* 92 F.3d 139, 149 (3d Cir.1996) (explaining that courts should examine "whether [the debtor] received any benefit . . . whether direct or indirect, without regard to the cost of [] services, the contractual and arms-length nature of the relationship, and the good faith of the transferee"). If value was conferred, then the court must determine, under a totality of the circumstances standard, whether that value was reasonably equivalent to what the debtor gave up. *Id.* Courts have generally considered three factors in this regard: (1) whether the transaction was at arm's-length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the assets transferred and the price paid. *See id.* at 145.

The Committee's conclusory allegation that "each of the Debtors received less than reasonably equivalent value in exchange for the Prepetition LF Transfers" is a legal conclusion that fails to state facts sufficient to establish (1) whether the Debtors received any value at all and (2) any of the totality of the circumstances elements and is thus wholly insufficient to state a claim upon which relief may be granted. *See Insys Liquidation Trust v. Quinn Emanuel Urquhart & Sullivan, LLP (In re Insys Therapeutics, Inc.)*, 2021 WL 5016127, at \*4 (Bankr. D. Del. Oct. 28, 2021) (holding plaintiff must "allege some facts that would ultimately support a finding regarding the lack of reasonably equivalent value"). The allegation is also directly contradicted by facts the Committee does plead, namely that the $31,660 in legal fees was paid in satisfaction of amounts owing under the Board-approved Loan Documents (whereby the Debtors obtained $42 million of fresh liquidity). *See* Compl. ¶¶ 51, 36-94. Under the circumstances then, even if the Loan Documents were not secured, there was still no fraudulent transfer. *See Walker v. Pasteur (In re Aphton Corp.*), 423 B.R. 76 (Bankr. D. Del. 2010) ("[W]hen a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent."); *In re Crucible Materials*

*Corp.,* 2012 WL 5360945 *8 (Bankr. D. Del. June 11, 2012) (dismissing §548 fraudulent transfer claim where transfer was a payment of antecedent debt).

The Committee's threadbare recitation of the solvency element similarly fails to pass muster. The Committee has alleged no facts to establish the Debtors' insolvency at any point, much less at the time of the transfer. *See Insys Therapeutics*, 2021 WL 5016127, at *5 (dismissing § 548 claim where plaintiff plead no facts to support a finding of insolvency). In fact, the Committee does not even allege ***when*** the complained-about payment or payments were made. Nor has the Committee alleged facts to support a finding that the payment of $31,660 in legal fees left the Debtors with unreasonably small capital or caused them to take on debts they could not pay. For these reasons, the Court should dismiss the claim for fraudulent transfer of legal fees.

## IV.    **The Committee has Failed to State a Claim for Avoidance of Post-Petition Legal Fees Authorized under the Final DIP Order**

The Committee seeks to avoid and recover the "Post-Petition LF Transfers" (*i.e.,* the legal fees being paid to Barings pursuant to Paragraph 15(c) of the Final DIP Order) as unauthorized post-petition transfers. *See* Compl. Count IV. As with Count III for fraudulent transfer, the Committee concedes that the claim is relevant only to the extent that its recharacterization or equitable subordination claims prove successful. *See* Compl. ¶ 132. If the Court dismisses the Committee's recharacterization and equitable subordination claims, this claim for unauthorized postpetition transfers should be dismissed as well.

But even if the recharacterization or equitable subordination claims go forward, Bankruptcy Code section 549 does not permit avoidance of the Post-Petition LF Transfers. Section 549(a) authorizes a trustee to avoid a post-petition "transfer of property of the estate . . . that is ***not authorized*** under this title or ***by the court***." 11 U.S.C. § 549(a) (emphasis added). On its face, therefore, section 549 does not apply to transactions—like the Post-Petition LF Transfers—that

are undertaken with express court authority, even if that authority is later revoked or deemed invalid. *See Terry Oilfield Supply Co. v. Am. Sec. Bank, N.A.*, 195 B.R. 66, 72 (S.D. Tex. 1996) ("Court-authorized post-petition transfers of estate property cannot later be avoided by the debtor-in-possession. The court-approved contract alienates the debtor's property from the bankruptcy estate, and the estate cannot get it back."); *Crucible*, 2012 WL 5360945 *8-9 (dismissing § 549 claim where court order authorized payment of sale proceeds).

The Committee concedes that the Post-Petition LF Transfers were (and continue to be) made with Court authority pursuant to the Final DIP Order. Compl. ¶ 134. It seems to allege, however, that such authority will retroactively vaporize if the Loans are recharacterized or equitably subordinated. Compl. ¶ 135. This is not the case. Even if the basis for the Final DIP Order (*i.e.*, Barings' existing security interest) proves unsound, the fact remains that the Post-Petition LF Transfers are being made pursuant to a final court order.[15] And because the payments are being made pursuant to a final court order, they may not be avoided under section 549. Thus, the Court should also dismiss the claim for avoidance of post-petition legal fees.

**V.     The Committee has Failed to State a Claim to Avoid the Security Interest Transfer as a Preference**

The Committee also seeks to avoid as a preferential transfer the "Security Interest Transfer" (i.e., the DACA) pursuant to Bankruptcy Code section 547(b). This claim must fail because—despite its formulaic recitation of the element—the Committee cannot plausibly allege that Barings "will receive more on account of its debt than if [the Debtors'] case was a case under chapter 7 of the Bankruptcy Code, the [Security Interest Transfer] had not been made, and [Barings] received payment of such debt to the extent provided in the Bankruptcy Code." 11 U.S.C. § 547(b); Compl.

---

[15]     If the Committee prevails on its equitable subordination or recharacterization claim, its remedy (subject to Rule 60 of the Federal Rule of Bankruptcy Procedure) will be to seek modification of the Final DIP Order to revoke the Court's authorization for future Post-Petition LT Transfers.

¶ 145. Indeed, Barings has and will retain a perfected security interest over the cash held in the DACA account regardless of whether the DACA is avoided.

A deposit account control agreement allows a secured creditor (1) to gain control over and (2) to perfect a security interest in, cash deposited into a deposit account. *See* N.Y. U.C.C. Law § 9-104 (McKinney). But contrary to the Committee's allegation, a DACA is not the only means by which a secured creditor can hold a perfected lien in cash. Rather, a secured creditor with a perfected security interest in collateral will have a perfected interest in the identifiable proceeds of that collateral—even if those proceeds are in a deposit account that is not subject to a deposit account control agreement. *See id.* § 9-102(64)(A) (proceeds of collateral are, among other things, whatever is acquired upon the sale of and is collected or distributed on account of collateral); *see also id.* § 9-315(a)(2) (a security interest continues in collateral notwithstanding a sale or other disposition of collateral, with a security to attach to identifiable proceeds of collateral); *id.* § 9-315(c) (a security interest in proceeds is perfected if the security interest in the original collateral was perfected). *Compare to id.* § 9-104 (Official Comment ¶ 2) ("when a deposit account is taken as *original collateral*, the only method of perfection is obtaining control under this section") (emphasis added).

Barings has an uncontested, valid, continuing and enforceable lien on substantially all of the Debtors' assets, including the proceeds of its collateral. *See* Ex. 2, § 9.01; ECF 180 at ¶ D.ii(b); Ex. 15. When a portion of that collateral was sold in November 2022, and the cash proceeds thereof were placed in the Debtors' bank account, Barings continued to have a perfected lien over such proceeds.[16] *See Ad Hoc Grp. of Second Lien Creditors v. LNV Corp (In re Paloma Generating*

---

[16]    Notably, when the remainder of the Debtors' assets were sold in these bankruptcy cases, Barings' perfected lien attached to the proceeds of that collateral as well (without regard to whether it was deposited into an account subject to a deposit account control agreement). *See* ECF 361 ¶¶ 8-9.

*Co.)*, 609 B.R. 80, 97 (D. Del. 2019) ("Intuitively, there are no truer definition[s] of 'proceeds of Collateral' other than the proceeds from the sale of Collateral") (internal citations omitted); (*see also* Ex. 15, § 2 ("The Property Sale Proceeds [to be placed in the DACA account] are and shall remain subject to the Liens of the Lenders.")). This was true regardless of whether or not a deposit account control agreement was in place. The DACA did not—and was not necessary to—give Barings an original lien over the cash proceeds of its collateral. It simply gave Barings *control* to sweep the account, which it did not do.

Because Barings will have a valid, continuing and enforceable lien over funds in the DACA account, even if the DACA is avoided, the Committee cannot establish that the Security Interest Transfer caused or would cause Barings to receive more than it otherwise would in a chapter 7 case.[17] This claim must be dismissed.

## VI.    The Claim for Declaratory Judgment Regarding Perfection of the Trademark Must be Dismissed

The Committee seeks a declaratory judgement that the Debtors, as a hypothetical judgment creditor under section 544(b) of the Bankruptcy Code, have superior title in and to the Trademarks because Barings did not file an assignment with the U.S. Patent and Trade Office ("USPTO"). (*See* Compl. ¶¶ 150, 152.) However, the Committee's claim is based on an incorrect understanding of the law and must be dismissed.

A security interest in trademarks can only be properly perfected upon the filing of a UCC-1 financing statement with the correct state authority. *See Trimarchi v. Together Dev. Corp.*, 255 B.R. 606, 610 (D. Mass. 2000) ("[A]nalysis of Article 9 of the U.C.C., the Lanham Act, case law

---

[17]    Additionally, the Complaint itself evidences that the Debtors received contemporaneous new value—namely, Barings consented to the asset sale and waived its right to be immediately paid the proceeds of its collateral—in exchange for the DACA. *See* Ex. 15. This provides a separate and independent basis for dismissal of Count V. *See Crucible*, 2012 WL 5360945 at *4-5 (dismissing preference claim on motion to dismiss when affirmative ordinary course of business defense appeared "on the face of the complaint and present[ed] an 'insuperable barrier to recovery by the plaintiff.'"), *quoting Cont'l Collieries v. Shober,* 130 F.2d 631, 635-36 (3d Cir. 1942).

and general policy considerations indicates that the Lanham Act does not preempt the U.C.C.'s filing requirements and that the perfection of a security interest in a trademark is governed by Article 9"). While a secured party *can* file proof of a security interest in a trademark with the USPTO to prevent a bona fide purchaser of the trademark from obtaining superior rights, such filing does not perfect a security interest and is not required. *See Roman Cleanser Co. v. Nat'l Acceptance Co. of Am. (In re Roman Cleanser Co.)*, 43 B.R. 940, 944 (Bankr. E.D. Mich. 1984), *aff'd*, 802 F.2d 207 (6th Cir. 1986) (noting the manner of perfecting a security interest in trademarks is governed by U.C.C. Article 9, not by the Lanham Act and "recordation of other instruments relating to marks *is permissive* only") (emphasis added).

Barings was under no obligation to file an assignment with the USPTO with respect to its security interest in the Trademarks, and the Committee has alleged no other basis for a declaratory judgment to the contrary. The Committee's claim for declaratory judgment must be dismissed.

## VII.    The Committee's Claims Against the Individual Defendants Should Be Dismissed

The Committee also asserts state law claims against the Individual Defendants. Specifically, the Committee contends that the Individual Defendants (i) breached contractual duties to refrain from willful misconduct and bad faith, and (ii) violated the implied contractual covenant of good faith and fair dealing under Delaware state law. *See* Compl. ¶¶ 157-74. However, the claims against the Individual Defendants are derivative causes of action of the Debtors' estate (*i.e.*, they do not arise under the Bankruptcy Code), and the Committee is barred from asserting those claims because the Debtors released their right to do so prior to these chapter 11 cases. Moreover, the claims against the Individual Defendants fail because (a) the LLCA eliminated the Individual Defendants' duties (to the extent permitted by Delaware law); and (b) the implied covenant claim — which could not be eliminated in the LLCA

under Delaware law — is not cognizable under the circumstances here and (c) the Complaint contains no allegations that the Individual Defendants breached any duty or acted improperly.

A.  **<u>The Committee Lacks Standing to Bring Claims Against the Individual Defendants Because the Debtors Released Those Claims</u>**

The Committee alleges that each of the Individual Defendants—all of whom were employees of Barings LLC during the relevant period—breached various fiduciary duties to GigaSphere Holdings by approving the Loans. *See id*. ¶¶ 162-172.

The Debtors, however, released these claims prior to filing their bankruptcy cases. Specifically, as consideration for the Forbearance Agreement—and again as consideration for the Second Forbearance Agreement—the Debtors released and covenanted not to sue, among others, the employees of Barings and its affiliates in connection with "the Obligations, Loan Documents, [the Forbearance Agreement] and the transactions contemplated thereby":

> Each of the Loan Parties . . . in consideration of the Secured Parties' execution and delivery of this Agreement and for other good and valuable consideration . . . releases, waives and forever discharges (and further agrees not to allege, claim or pursue) any and all claims, rights, causes of action, counterclaims or defense of any kind whatsoever, in contract, in tort, in law or in equity, whether known or unknown, fixed or contingent, direct or indirect, joint and/or several, secured or unsecured, due or not due, liquidated or unliquidated, asserted or unasserted, or foreseen or unforeseen, which any of the Releasing Parties might otherwise have against the Secured Parties, their present or former subsidiaries and affiliates or any of the foregoing's **officers directors, employees, attorneys or other representatives, agents, investment managers, advisors, or sub-advisors, managed or advised accounts, funds, or other entities, affiliated investment funds or investment vehicles** (collectively, the "Releasees") in each case . . . **relating to the Obligations, the Loan Documents, this Agreement and/or the transactions contemplated thereby or hereby**.

Ex. 14, § 8 (emphasis added); *see also* Ex. 15, § 14.

The Bankruptcy Code authorizes a committee, as a representative of the bankruptcy estate, to assert claims derivative of the debtor ***only to the extent that the debtor could bring the same claim***. *See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.,* 267 F.3d 340, 356 (3d

31

Cir. 2001) (finding that committee's right to bring derivative claims is limited to "causes of action [actually] possessed by the debtor").[18] Committees are therefore without standing to raise derivative claims released by a debtor prepetition. *See U.S. Bank N.A. v. DHL Global Forwarding (In re Evergreen Solar, Inc.)*, 2014 WL 300965, at *2 Bankr. D. Del., Jan. 28, 2014) (finding a liquidation trustee is without standing to bring a claim the debtor released); *Minn. Corn Processors, Inc. v. Am. Sweeteners, Inc.* (*In re Am. Sweeteners, Inc.*), 248 B.R. 271, 275 (Bankr. E.D. Pa. 2000) (holding prepetition release of state law claims was enforceable); *see also Pliskin v. Radians Wareham Holdings Inc. (In re ICPW Liquidation Corp.)*, 600 B.R. 640, 663 (Bankr. C.D. Cal. 2019) (finding that enforcement of prepetition releases of state law claims does not "deprive any party of any rights or protections conferred by the Bankruptcy Code").

As the claims against the Individual Defendants are derivative causes of action of the Debtors' estate, the Committee can only prosecute them to the extent the Debtors could do so in their own right. *R.F. Lafferty,* 267 F.3d at 356. And, indeed, the Debtors—by executing the Releases—released their right to do so prior to filing their bankruptcy cases. *See ICPW Liquidation*, 600 B.R. at 663 (holding pre-petition release was enforceable post-petition). The Releases explicitly and broadly bar the Debtors from bringing claims against employees of Barings and its affiliates on account of the loan transactions. Ex. 14, § 8; Ex. 15, § 14. These are the exact parties from whom and the exact claims for which the Committee now seeks relief.

As the Debtors released the claims against the Individual Defendants before filing these bankruptcy cases, the Committee is without standing to bring them here. They must be dismissed.

---

[18]     Similarly, a committee is "subject to the same defenses as could have been asserted by the defendant had the action been instituted by the debtor." *R.F. Lafferty,* 267 F.3d at 356 (3d Cir. 2001) (*quoting Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir.1989)).

## B.    <u>The Claims Against the Individual Defendants Fail as a Matter of Law</u>

The express language of the LLCA bars the Committee's claims that the Individual Defendants had a contractual duty to refrain from willful conduct and bad faith. Delaware law allows parties to an LLCA to eliminate the inherent duties that members would otherwise owe to the company (with the exception of the implied covenant of good faith and fair dealing). 6 Del. C. § 18-1101(c). Here, section 5.8(c) of the LLCA unambiguously and completely eliminates those duties, stating as follows:

> Limitation of Duties; Conflict of Interest. To the maximum extent permitted by applicable law, including Section 18-1101(c) of the Delaware Act, and notwithstanding any other provision of this Agreement or any duty existing at law or in equity (including any fiduciary duty) or otherwise, the Company, each Member, each Manager and each Unitholder hereby (i) acknowledges and agrees that all fiduciary duties are eliminated with respect to, and no fiduciary duties shall apply to, the Board, any Manager, any Member or any Unitholder or any of their respective Affiliates, employees, employers, agents and representatives hereunder (the "**Covered Persons")** or any action taken or omission to take action by such Covered Persons in connection with the Company, and (ii) agrees that such Covered Persons shall not owe any fiduciary duty to the Company or any other Member, Manager or Unitholder or any creditor of the Company or any of its Subsidiaries. No Manager or Member shall be obligated to recommend or take any action in its capacity as a Manager or Member that prefers the interests of the Company or its Members, Managers or Unitholders or any of its Subsidiaries, on the one hand, over the interests of such Person or its Affiliates, employees, employers, agents or representatives, on the other hand, notwithstanding any duty existing at law or in equity (including any fiduciary duty).

Ex. 1, § 5.8(c).

The Delaware courts, including the Delaware Supreme Court, have held that similar language eliminates the traditional duties imposed by law. *See, e.g., Composecure, L.L.C. v. Cardux, LLC*, 206 A.3d 807, 821 n.65 (Del. 2018) (noting that the LLCA eliminated all fiduciary duties); *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *12 (Del. Ch. Oct. 28, 2010) (same). Section 5.8(c), therefore, precludes the Committee from asserting that the Individual Defendants had duties to refrain from willful misconduct or bad faith.

The Committee seeks to circumvent the plain language of section 5.8(c) by citing section 5.8(a) of the LLCA, which absolves managers of liability except in the case of willful misconduct or bad faith, or a violation of the implied covenant of good faith and fair dealing. *See* Ex. 1, § 5.8(a). The Delaware courts, however, have rejected efforts to transform such exculpatory provisions into positive duties. *See Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *9 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) ("[T]his Court declines to follow [counterclaimant's] invitation to turn an expressly exculpatory provision into an all-encompassing and seemingly boundless standard of conduct."); *Dawson v. Pittco Capital Partners, L.P.*, 2012 WL 1564805, at *26-28 (Del. Ch. Apr. 30, 2012) (following *Fisk Ventures*).

The Committee may cite to another Chancery Court case, *In re Cadira Grp. Holdings, LLC Litig.*, 2021 WL 2912479 (Del. Ch. July 12, 2021), but that case does not apply here. In *Cadira*, the court held that the exculpatory language at issue did not evince a "plain and unambiguous" intent, under the Delaware Code, to displace traditional fiduciary duties fully. *Id.* at *12. In this case, by contrast, section 5.8(a) could not be clearer in expressing the parties' intent to eliminate the traditional duties.[19]

The Committee's implied covenant claim also falls short and should be dismissed. As an initial matter, Vice Chancellor Laster recently noted that "[i]t is . . . wickedly difficult under Delaware law to prove a claim for breach of the implied covenant." *New Enter. Assocs. 14, L.P. v. Rich*, 295 A.3d 520, 581 n.237 (Del. Ch. May 2, 2023); *see also Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) ("Courts must be careful however not to

---

[19]    The Committee cites section 5.9 of the LLCA in support of its allegations, *see, e.g.*, Complaint, ¶ 159, but that section merely states that an "Interested Transaction" must be "on arm's length terms and have a reasonable business purpose." Section 5.9 does not seek to impose any duties on the Individual Defendants, as the Committee suggests. Moreover, the Committee's argument that section 5.9 somehow creates duties is directly contradicted by the specific provisions in section 5.8(c), and the parties' express intent to eliminate all duties.

overestimate the circumstances when it is appropriate to employ this intrinsically counterfactual and hindsight-bias prone test."). The implied covenant does not apply to this case, for two reasons.

*First*, the parties' express terms can displace the implied covenant, "enabling alternative [LLC] agreements to authorize a decision maker to consider and act based on its own interests, irrespective of the entity's interests." *New Enter. Assocs.*, 295 A.3d at 580 n.235. That is exactly what happened here. The last sentence of section 5.9(c) explicitly allows a manager to prefer his or her interests over that of the company. *Second*, it is well settled that the implied covenant "cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures*, 2008 WL 1961156, at *10; *see also Allied Capital*, 910 A.2d at 1032-33 ("[I]mplied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand, and only when the court finds that the expectations of the parties were so fundamental that it is clear that they did not feel a need to negotiate about them."); *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992) *aff'd*, 609 A.2d 668 (Del. 1992) ("[W]here the subject at issue is expressly covered by the contract . . . the implied duty to perform in good faith does not come into play."). Here, the LLCA not only "covers the subject at issue," it also clearly displaces the implied covenant through the last sentence in section 5.9(c).[20]

The Court, therefore, should dismiss the claims against the Individual Defendants even if it finds they have not been released under the Forbearance Agreement.

## CONCLUSION

For the foregoing reasons, the Barings Defendants respectfully request that all counts of the Complaint be dismissed, with prejudice.

---

[20]    In addition to the above, the Committee fails to allege facts in the Complaint sufficient to show that the Individual Defendants breached any duties or acted improperly.  The Barings Defendants reserved the right to address this point further in their reply.

Dated: July 24, 2023
      Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT
& TUNNELL LLP**

*/s/ Sophie Rogers Churchill*
Andrew Remming
Sophie Rogers Churchill
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone: (302) 658-9200
Email: aremming@morrisnichols.com
      srchurchill@morrisnichols.com

**HOGAN LOVELLS US LLP**
Pieter Van Tol
Christopher R. Bryant
390 Madison Avenue
New York, New York 10017
Telephone: (212) 983-3000
Email: pieter.vantol@hoganlovells.com
      chris.bryant@hoganlovells.com

-and-

**HOGAN LOVELLS US LLP**
Erin N. Brady
1999 Avenue of the Stars
Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
Facsimile:  (310) 785-4601
Email: erin.brady@hoganlovells.com

*Counsel for the Barings Defendants*