## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>GIGAMONSTER NETWORKS,<br>LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 23-10051 (JKS)<br><br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF GIGAMONSTER<br>NETWORKS, LLC, *et al.*,<br><br>Plaintiff,<br><br>v.<br><br>BARINGS ASSET-BASED INCOME<br>FUND (US), L.P., BABIF GIGABLOCKER LLC,<br>MATTHEW SANDOVAL, W.F. (ROONEY)<br>DEBUTTS, NISANTH REDDY, and JULIE<br>NIEDZWIECKI,<br><br>Defendants. | Adv. Case No. 23-50404 (JKS) |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO MOTION TO DISMISS

### FAEGRE DRINKER BIDDLE & REATH LLP

Patrick A. Jackson (No. 4976)          Richard J. Bernard
Jaclyn C. Marasco (No. 6477)           1177 Avenue of the Americas
222 Delaware Avenue, Suite 1410        New York, New York 10036
Wilmington, Delaware 19801             Telephone: (212) 248-3140
Telephone: (302) 467-4200              Facsimile: (212) 248-3141
Facsimile: (302) 467-4201              richard.bernard@faegredrinker.com
patrick.jackson@faegredrinker.com
jaclyn.marasco@faegredrinker.com

*Counsel to the Official Committee of Unsecured Creditors*

Dated: August 14, 2023

---

[1]    The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: GigaMonster Networks, LLC (2854); Gigasphere Holdings LLC (0250); GigaMonster, LLC (3014); Fibersphere Communications LLC (0163); and Fibersphere Communications of California LLC (5088). The Debtors' business address is 350 Franklin Gateway, Suite 300, Marietta, GA 30067.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

OVERVIEW OF PLAINTIFF'S ALLEGATIONS ................................... 3

ARGUMENT........................................................................................... 9

I. Under the Standard That Governs Motions to Dismiss, Barings' Argument that Plaintiff's Claims Lack Plausibility Must Be Rejected. ............................................. 9

    A. The Complaint States a Plausible Claim for Recharacterization of the Alleged Loans Under the *AutoStyle* Factors (Count I)................................... 11

        i. There Was a Clear Identity of Interest Between Barings and the Debtors, Barring an Arm's Length Negotiation..................................... 12

        ii. The Debtors Were Undercapitalized at All Relevant Times................... 16

        iii. Barings' Only Hope of Repayment Turned on the Success of the Debtors. ............................................................................................ 18

        iv. The Complaint Adequately Alleges the Debtors' Inability to Obtain Financing from Outside Lending Institution........................................... 20

        v. The Existence of a "Loan Agreement" Cannot be Regarded as Conclusive in a Recharacterization Inquiry............................................ 21

        vi. The "Fixed" Maturity Date Was Repeatedly Extended and Never Enforced. .......................................................................................... 22

        vii. Interest Automatically Accrued as PIK Interest Without Any Demands for Cash Payment or Modification of the "Loan Agreement."...................................................................................... 23

        viii. The Economic Reality of the Circumstances Warrants Denial of the Motion to Dismiss. ................................................................ 24

    B. The Committee Has Adequately Pleaded Its Alternative Claim for Equitable Subordination (Count II). ............................................................... 25

        i. Barings's Secured Claim Warrants Special Scrutiny Because Barings Is an Insider. ........................................................................ 26

        ii. Barings' Conduct Harmed the Debtors' Unsecured Creditors or Conferred an Unfair Advantage on Barings. ......................................... 27

        iii. Equitable Subordination of Barings' Secured Claim is Consistent with the Bankruptcy Code........................................................ 29

    C. Assuming Recharacterization or Subordination, the Complaint States a Plausible Claim for Avoidance and Recovery of the Prepetition LF Transfers (Count III). ...................................................................... 30

        i. The Complaint Adequately Alleges a Lack of Reasonably Equivalent Value. ............................................................................ 31

US.359008610.02

ii. The Complaint Adequately Pleads the Debtors' Insolvency...................32

D. Assuming Recharacterization or Subordination, the Complaint States a Plausible Claim for Avoidance and Recovery of Post-Petition Legal Fees Under the Final DIP Order (Count IV).........................................................33

E. The Complaint States a Plausible Claim to Avoid the Security Interest Transfer as a Preference (Count V)..................................................................34

II. Plaintiff Should Be Granted Leave to Replead in the Event the Court Determines that Any of the Claims are Inadequately Pleaded..........................................................35

CONCLUSION....................................................................................................................35

US.359008610.02

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*In re Adelphia Commc'ns Corp.*,
  365 B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd in part sub nom.*, 390 B.R. 64
  (S.D.N.Y. 2008) ....................................................................................... 10, 12, 32

*In re: Aéropostale, Inc.*,
  555 B.R. 369 (Bankr. S.D.N.Y. 2016)........................................................... 2

*In re Aphton Corp.*,
  423 B.R. 76 (Bankr. D. Del. 2010) ........................................................... 31, 32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).......................................................................................... 9

*In re AtlanticRancher, Inc.*,
  279 B.R. 411 (Bankr. D. Mass. 2002) ............................................................ 23

*Autobacs Strauss, Inc. v. Autobacs Seven Co.*,
  473 B.R. 525 (Bankr. D. Del. 2012)....................................................... *passim*

*In re AutoStyle Plastics, Inc.*,
  269 F.3d 726 (6th Cir. 2001) ................................................................. *passim*

*Bagic v. Univ. of Pittsburgh*,
  773 F. App'x 84 (3d Cir. 2019) ..................................................................... 17

*In re Bayou Steel BD Holdings, L.L.C.*,
  642 B.R. 371 (Bankr. D. Del. 2022).............................................................. 32

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................... 9

*In re BH S & B Holdings LLC*,
  420 B.R. 112 (Bankr. S.D.N.Y. 2009), *aff'd as modified,* 807 F. Supp. 2d 199
  (S.D.N.Y. 2011) ............................................................................................ 15

*In re Broadstripe, LLC*,
  444 B.R. 51 (Bankr. D. Del. 2010) .................................................................. 2

*In re Charys Holding Co. Inc.*,
  443 B.R. 628 (Bankr. D. Del. 2010)............................................................... 31

*Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
  160 F.3d 982 (3d Cir.1998)............................................................ 25, 26, 27, 30

US.359008610.02

*In re Cold Harbor Assocs., L.P.*,
  204 B.R. 904 (Bankr. E.D. Va. 1997) ..................................................13, 14, 21

*In re Daewoo Motor Am., Inc.*,
  471 B.R. 721 (C.D. Cal. 2012) *aff'd*, 554 F. App'x 638 (9th Cir. 2014) ..............................2

*In re Daugherty Coal Co., Inc.*,
  144 B.R. 320 (N.D. W.V. 1992) ..................................................... 28

*In re DVI, Inc.*,
  326 B.R. 301 (Bankr. D. Del. 2005) ................................................. 32

*In re Evergreen Energy, Inc.*,
  546 B.R. 549 (Bankr. D. Del. 2016) ................................................. 9

*In re Exide Techs., Inc.*,
  299 B.R. 732 (Bankr. D. Del. 2003) ..............................................12, 32

*Matter of Fabricators, Inc.*,
  926 F.2d 1458 (5th Cir. 1991) ...................................................26, 28

*Fin Hay Realty Co. v. United States*,
  398 F.2d 694 (3d Cir. 1968) ....................................................... 14

*Friedman's Liquidating Tr. v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*,
  452 B.R. 512 (Bankr. D. Del. 2011) ...........................................*passim*

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018) ...............................................2, 15

*LaMonica v. Tilton (In re TransCare Corp.)*,
  602 B.R. 234 (Bankr. S.D.N.Y. 2019) .............................................. 10

*In re Lane*,
  742 F.2d 1311 (11th Cir. 1984) .................................................... 19

*In re LMI Legacy Holdings, Inc.*,
  No. 13-12098 (CSS), 2017 WL 1508606 (Bankr. D. Del. Apr. 27, 2017) *aff'd*,
  625 B.R. 268 (D. Del. 2020) .....................................................10, 26

*In re Marketxt Holdings Corp.*,
  361 B.R. 369 (Bankr. S.D.N.Y. 2007) .............................................. 29

*In re Mid-Am. Waste Sys., Inc.*,
  284 B.R. 53 (Bankr. D. Del. 2007) ...............................................26, 27

iv

*In re Mobile Steel Co.*,
    563 F.2d 692 (5th Cir. 1977) .................................................................. 26, 30

*In re Motors Liquidation Co.*
    552 B.R. 253 (Bankr. S.D.N.Y. 2016) ...................................................... 33

*In re N & D Prop., Inc.*,
    799 F.2d 726 (11th Cir. 1986) .................................................................. 28

*Pardo v. Nylcare Health Plans, Inc.*,
    274 B.R. 408 (Bankr. D. Del. 2001) .......................................................... 33

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002) ...................................................................... 31

*In re Province Grande Olde Liberty, LLC*,
    655 F. App'x 971 (4th Cir. 2016) ................................................................ 14

*In re Radnor Holdings Corp.*,
    353 B.R. 820 (Bankr. D. Del. 2006) ............................................................ 2

*Rodolakis v. Chertoff (In re 1236 Dev. Corp.)*,
    188 B.R. 75 (Bankr. D. Mass. 1995) ........................................................ 28

*Roth Steel Tube Co v. C.I.R.*,
    800 F.2d 625 (6th Cir. 1986) ...................................................................... 12

*In re SubMicron Sys. Corp.*,
    432 F.3d 448 (3d Cir. 2006) ................................................................*passim*

*Toll Bros., Inc. v. Twp. Of Readington*,
    555 F.3d 131 (3d Cir. 2009) ...................................................................... 35

*U.S. Express Lines Ltd. v. Higgins*,
    281 F.3d 383 (3d Cir. 2002) ........................................................................ 9

*United States v. State St. Bank & Tr. Co.*,
    520 B.R. 29 (Bankr. D. Del. 2014) ......................................................*passim*

*Vila v. Inter-Am. Inv. Corp.*,
    570 F.3d 274 (D.D.C. 2009) ........................................................................ 9

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
    544 B.R. 75 (Bankr. S.D.N.Y. 2016) ...................................................... 10, 24

*In re Winstar Comms., Inc.*,
    348 B.R. 234 (Bankr. D. Del. 2005) .......................................................... 26

**Statutes, Rules & Regulations**

11 U.S.C. § 101(31) ............................................................................................. 13

11 U.S.C. § 510 ................................................................................................... 30

11 U.S.C. § 547 ................................................................................................... 34

11 U.S.C. § 548 ..............................................................................................30, 31

11 U.S.C. § 549 ................................................................................................... 33

Fed. R. Civ. P. 8 ................................................................................................... 1

Fed. R. Civ. P. 12 .............................................................................................9, 30

Fed. R. Civ. P. 15(a) ........................................................................................... 35

Fed. R. Civ. P. 56 ................................................................................................. 9

UCC § 9-104 Cmt. 2 ............................................................................................ 34

UCC § 9-315(b)(2) ............................................................................................... 34

US.359008610.02

The Official Committee of Unsecured Creditors (the "Committee" or "Plaintiff") appointed in the chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its counsel, derivatively on behalf of the Debtors, respectfully submits this answering brief in opposition to the *Barings Defendants' Motion to Dismiss* and supporting memorandum of law and declaration [Adv. D.I. 14-16] (together, the "Motion to Dismiss")[2] filed by Defendants Barings Asset-Based Income Fund (US), L.P. ("Barings LP") and BABIF Gigablocker LLC ("Barings Blocker" and together with Barings LP, "Barings"), Matthew Sandoval, W.F. (Rooney) deButts, and Julie Niedzwiecki (collectively, the "Individual Defendants" and together with Barings, the "Barings Defendants").[3]

## PRELIMINARY STATEMENT

The Motion to Dismiss reads like a motion for summary judgment, relying on non-public documents to establish "facts," which Barings summarily contends warrant dismissal of the Complaint without any formal discovery or a trial. Barings relies on its own voluntary production of documents—made pursuant to a strict non-disclosure agreement ("NDA")—as purported evidence of the Complaint's inadequacy because no documents were attached to the Complaint. *But see* Fed. R. Civ. P. 8(a)(2) (requiring "*a short and plain statement* of the claim showing the pleader is entitled to relief.") (emphasis added). By applying the wrong framework, Barings purports to simply ignore the detailed allegations in the Complaint (which, coincidentally, must be taken as true) in favor of its own, independent summary of the non-public documents it produced pursuant to the NDA, apparently prodding the Court to rule on the merits. And, further

---

[2]   Citations to the Motion to Dismiss shall refer to the supporting memorandum of law. The supporting declaration is referred to herein as the "Brady Declaration."

[3]   As of the date of filing this answering brief, Plaintiff and the Barings Defendants are negotiating the terms of a stipulation dismissing certain counts of Plaintiff's complaint [Adv. D.I. 1] (the "Complaint"), including Count VI against Barings, with prejudice, and Count VII against the Individual Defendants, without prejudice.

bootstrapping its position, Barings often relies on cases deciding questions of recharacterization and equitable subordination *after* completion of formal discovery, at the summary judgment or trial stage.[4] Put simply, the Motion to Dismiss puts the cart before the horse.

The issue before the Court at this stage of the proceeding is whether the Complaint—filed by a party in interest with undisputed standing to assert a Challenge—states a claim upon which relief can be granted; that is, whether it plausibly alleges that Barings, the $65 million investor and 54% majority interest holder in GigaSphere Holdings (the parent company and sole owner of all remaining Debtors), manifested the attributes of ownership in the Debtors by its acts and conduct, such that its seven advancements to the Debtors of well over $40 million in a two-year period, when the Debtors were severely undercapitalized with consistently negative cash flow projections and EBITDAs, without ever requiring the Debtors to make a single cash payment on interest or principal or even threatening foreclosure, *and where Barings stood on both sides of all such transactions,* can be viewed as equity contributions in the Debtors, intended to bolster or otherwise salvage Barings' return on its investment.

---

[4]    *See generally* Mot. citing, *e.g., In re SubMicron Sys. Corp.*, 432 F.3d 448, 453 (3d Cir. 2006) ("After a bench trial before Judge Sue Robinson in late July/early August 2001, she ruled against Cohen, setting out her reasoning in a comprehensive opinion. Cohen appeals."); *In re Daewoo Motor Am., Inc.,* 471 B.R. 721, 728 (C.D. Cal. 2012) (on appeal after four-day bench trial) *aff'd,* 554 F. App'x 638 (9th Cir. 2014); *In re HH Liquidation, LLC*, 590 B.R. 211, 219 (Bankr. D. Del. 2018) ("The Court conducted a five day trial and received hundreds of exhibits. . . ."); *In re: Aéropostale, Inc.*, 555 B.R. 369, 375 (Bankr. S.D.N.Y. 2016) ("The Court held a trial with fourteen live witnesses from August 15, 2012, to August 23, 2012. In support of its case, the Debtors filed declarations in lieu of direct testimony for six witnesses, together with over 400 accompanying exhibits."); *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 65 (Bankr. D. Del. 2014) ("[A]fter numerous discovery motions and pre-trial motions, trial began on October 16, 2006, and continued on the following dates: October 17, 18, 19, 20, 23, 25, 26, 27, 30, 31, 2006; November 1, 2, 3, 2006; December 11, 12, 13, 14, 2006; January 19, 2007; February 12, 28, 2007; March 1, 2, 5, 6, 30, 2007; April 23, 2007; and May 10, 22, 23, 24, 25, 2007. Closing arguments were completed on June 22, 2007. Thereafter, the parties began their post-trial briefing, which introduced more rounds of motions."); *In re Broadstripe, LLC*, 444 B.R. 51, 59 (Bankr. D. Del. 2010) (considering motions for summary judgment); *In re Radnor Holdings Corp.*, 353 B.R. 820, 827 (Bankr. D. Del. 2006) ("The Court conducted eight full days of trial between November 2 and November 14, 2006, heard testimony from fourteen witnesses and admitted more than 350 documents into evidence.").

As shown below, Plaintiff's allegations are more than adequate under the standard applicable to motions to dismiss, and the Motion to Dismiss should be denied.

## OVERVIEW OF PLAINTIFF'S ALLEGATIONS

From the respective dates of their formation, the Debtors continued to lose money through operations and were consistently unprofitable with continued projected cash flow losses. Compl. ¶ 36. On November 7, 2019, the Barings funds came into the picture, purchasing 65 million newly issued and authorized Preferred Units (the "Barings Units") of GigaSphere Holdings LLC ("GigaSphere Holdings") for an aggregate purchase price of $65 million pursuant to a Preferred Units Purchase Agreement (the "Units Purchase Agreement") by and between Barings and GigaSphere Holdings—and taking out the Debtors' significant prior indebtedness to Post Road. *Id.* ¶ 22. Of the $65 million purchase price, Barings LP contributed $59,602,665.46 (91.7%) and Barings Blocker contributed $5,397,334.54 (8.3%). *See id.* ¶ 43. The Barings Units collectively represent an approximately 54% controlling interest in GigaSphere Holdings. *Id.* ¶ 24; Mot. at 3.

GigaSphere Holdings owns 100% of the membership interests in Debtor GigaMonster Networks, LLC ("GigaMonster Networks"), which then owns 100% of the membership interests in Debtors GigaMonster LLC and Fibersphere Communications LLC. Compl. ¶¶ 19-20. Fibersphere Communications (OR), in turn, owns 100% of the membership interests in Fibersphere Communications of California LLC. *Id.* ¶ 20. Thus, as illustrated in the *Declaration of Rian Branning in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [D.I. 3] (the "First Day Declaration"), of which the Court can take judicial notice, Barings came to hold a controlling interest in the Debtor entity that has sole ownership of all others:

3



First Day Decl. ¶ 18.

The board of GigaSphere Holdings (the "Board") consists of five managers (the "Managers"). Compl. ¶ 25. The amended and restated limited liability company agreement for GigaSphere Holdings (the "A&R LLCA") grants Barings, the majority equity holder of GigaSphere Holdings, the right to appoint three of the five Managers (i.e., the majority) to the Board (the "Barings Managers"). *Id.* A fourth seat on the Board is held by the chief executive officer of GigaSphere Holdings (the "CEO"), which Barings has the right to hire and fire. *Id.* The Barings Managers and the CEO then collectively appoint the fifth Manager. *Id.*; Ex. to Brady Decl. ("Ex.") 1 § 5.2(a)(iii). At all relevant times, all Barings Managers were employed by Barings LLC while simultaneously sitting on the Board. *Id.* ¶¶ 12-15. And for the avoidance of doubt, the A&R LLCA is clear that the Board exercises all rights and powers to act on behalf of GigaSphere Holdings, which has full control over all subsidiaries. *See* Ex. 1 § 5.1.

US.359008610.02

Thus, as alleged in the Complaint, the Board has complete management authority over the business and affairs of the Debtors, subject to certain exceptions, including the limited veto right of a "Non-Barings Representative" in four specific circumstances—none of which has any bearing on the allegations of the Complaint.[5] *Id.* ¶¶ 29 & 30; Ex. 1 § 5.1(e)(A)-(D). Even if such veto right had any application here, the A&R LLCA states that the Non-Barings Representative is designated to the Board by a Non-Barings Majority Interest—defined as Members who are not Barings Investors and who hold a majority of the Preferred Units held by the Members (excluding the Preferred Units held by the Barings Investors); neither the Court nor the Plaintiff has any means of determining, at this stage, whether Rick Neuman or the Members holding a majority of the Preferred Units (excluding the Preferred Units held by the Barings Investors) has any affiliation with, or ownership by, Barings. *See* Mot. at 3 & n.5.

Consistent with the Debtors' poor financial performance prior to the Units Purchase Agreement, as of December 31, 2020, the gross internal rate of return on the Barings Units, before expenses, management fees, and carried interest, was –21.6%, with continued projections of cash flow losses. Compl. ¶ 37. Apparently dissatisfied with the continuing downward trend in its investment, and presumably with knowledge that, at various times, approximately $30-75 million of additional capital would be necessary for the Debtors' operations to become self-sustaining on a free cash flow basis, on October 23, 2020, the Barings-controlled Board caused the Debtors to enter a Loan and Security Agreement (the "<u>Initial Loan Agreement</u>" as amended, the "<u>Loan</u>

---

[5]    Barings does not dispute, nor does the A&R LLCA contradict, Barings' control of the Board, or the Board's nearly plenary control over the Debtors. As further set forth below, to the extent Barings purports to argue, in the Motion to Dismiss, that the Loans (as defined below) were not literally *equity securities issuances* because equity securities issuances may, in some circumstances, be subject to preemptive rights, which cannot be waived by the Board without approval of the Non-Barings Representative, it ignores entirely the equitable nature of the recharacterization and equitable subordination analyses, which does in fact account for the possibility that a purported debt transaction is a ruse. *See* Mot. at 19. To be clear, the A&R LLCA grants the Board the "right to determine the timing, amount, and other terms of any *equity investment* in the Company." Ex. 1 § 5.1(b) (emphasis added).

Agreement," and together with each of the six amendments to the Loan Agreement, the "Loan Documents," and the capital contributed by Barings under the Loan Documents, the "Loans") *with Barings*, now as a purported lender, pursuant to which Barings advanced to the Debtors $7.5 million with a stated maturity date of October 23, 2021. Compl. ¶ 38; Ex. 5 § 1.01. Prior to entry into the Initial Loan Agreement, the Debtors' assets (excluding certain equipment) were unencumbered. Compl. ¶ 120. Pursuant to the Loan Agreement, however, the Loans were secured by a perfected first-lien security interest in substantially all of the Debtors' assets. *Id*. ¶¶ 46, 47.

The Initial Loan Agreement was executed by the CEO (which Barings had the authority to hire or fire), on behalf of the Debtors, and Matthew Sandoval on behalf of Barings. *Id*. ¶ 39. Mr. Sandoval was also Barings Manager. *Id*. ¶ 40. Barings LP and Barings Blocker contributed capital under the Initial Loan Agreement in the same ratios as their initial equity investments and their Barings Units (i.e., 91.7% and 8.3%, respectively)—as they did with all subsequent contributions under the Loan Documents. *Id*. ¶ 43; *see infra* at 8.

At the time of closing of the Initial Loan Agreement, the Debtors' trailing twelve-month consolidated EBITDA was –$5.5 million, and, as Barings well knew, the Debtors had failed to generate consolidated revenue of over $5 million in any of the previous three quarters. Compl. ¶ 42. Recognizing that the Debtors would be unable to service the 12% annual interest payable on a quarterly basis, the Loan Agreements were structured with a PIK toggle, under which PIK interest was the default election absent affirmative payment of cash interest. *Id*. ¶ 44. The Debtors never paid, nor did Barings ever demand (through the amendments to the Loan Agreements (the "Amendments") or otherwise), any cash interest payments at any point during the life of the Loans. *Id*. ¶¶ 57, 65, 72, 80 & 96.

From this starting point of poor financial performance, the Amendments were then executed in rapid succession within a two-year period, during which Barings—the $65 million investor and 54% controlling interest holder in GigaSphere Holdings—piled an additional $44,753,155.64 into the Debtors, while *loosening* EBITDA covenants and *lowering* EBITDA hurdles in the Loan Agreement, *extending* maturity dates, and ignoring numerous events of default. Compl. ¶¶ 36, 64, 79, 85-86 & 109-10; Ex. 7, Art. VII; First Day Decl. ¶ 19 (after "numerous events of default under the Prepetition Loan Documents, the Prepetition Lenders agreed, on multiple occasions, to forbear from exercising rights and remedies against the Debtors."). But alas, Barings' efforts to achieve some return on its investment remained insufficient; by the time of the Sixth Amendment, the Debtors' trailing twelve-month consolidated EBITDA was now approximately –$7.8 million. Compl. ¶ 95. And by this time, the purported debt issued by Barings well exceeded the Debtors' enterprise value.[6] *Id.* ¶ 122.

Each of the Amendments was executed by the CEO, on behalf of the Debtors, and Matthew Sandoval on behalf of Barings. *Id.* ¶¶ 53, 61, 68, 74, 82, 87 & 92. Coincidentally, Mr. Sandoval also executed the written consents approving each of the Amendments (and thus, the incurrence of the purported debt from Barings) on behalf of the Debtors, in his capacity as a Barings Manager, without recusing himself. *Id.* ¶¶ 12, 54, 62, 69. 75, 83, 88 & 93; Ex. 12. From this standpoint, as further evidenced by the summary below, Barings did not conduct itself as a true lender.

---

[6]    By the time the Debtors commenced the chapter 11 cases, they could not secure a third-party bank loan. First Day Decl. ¶ 26 ("By the summer of 2022, the Company was running out of cash and was unable to secure additional financing or investment capital to finance additional growth or support operations.").

| Agreement | Date Agreement Executed | Passage of Time | Amount | Balance | Barings LP vs. Barings Blocker Contribution | Stated Maturity |
|---|---|---|---|---|---|---|
| Units Purchase Agreement | Nov. 7, 2019 | N/A | $65 million | N/A | $59,602,665.56 (**91.7%**) vs. $5,397,334.54 (**8.3%**) Par. 43 | N/A |
| Initial Loan Agreement | Oct. 23, 2020 Par. 38 | 351 days after Units Purchase Agreement | $7.5 million - Par. 43 | $7.5 million Ex. 11 | $6,877,230.63 (**91.7%**) vs. $622,769.37 (**8.3%**) Ex. 2, Sched. 1.01 | Oct. 23, 2021 Par. 45 |
| First Amendment | Feb. 19, 2021 Par. 52 | 119 days after Initial Loan Agreement | $7.5 million - Par. 56 | $15,296,221.31 Ex. 11 | $14,026,085.67 (**91.7%**) vs. $1,270,135.76 (**8.3%**) Ex. 5, Sched. 1.01 | Extended to Feb. 19, 2022 Par. 58 |
| Second Amendment | July 6, 2021 Par. 60 | 137 days after First Amendment | $7.5 million Par. 64 | $23,492,509.54 Ex. 11 | $21,541,787.49 (**91.7%**) vs. $1,950,722.05 (**8.3%**) Ex. 6, Sched. 1.01 | Feb. 19, 2022 Ex. 6 |
| Third Amendment | Nov. 5, 2021 Par. 67 | 123 days after Second Amendment | $7.5 million Par. 67 | $31,942,645.98 Ex. 11 | $29,290,259.11 (**91.7%**) vs. $2,652,386.87 (**8.3%**) Ex. 7, Sched. 1.01 | Extended to Nov. 5, 2022 Par. 67 |
| Fourth Amendment | March 11, 2022 Par. 73 | 127 days after Third Amendment | $5 million – Par. 77 | $38,279,393.38 Ex. 11 | $35,100,828.88 (**91.7%**) vs. $3,178,564.50 (**8.3%**) Ex. 8, Sched. 1.01 | Extended to March 11, 2023 Par. 78 |
| Fifth Amendment | May 27, 2022 Par. 81 | 88 days after Fourth Amendment | $5 million - Par. 81 | $44,253,155.64 Ex. 11 | $40,578,554.91 (**91.7%**) vs. $3,674,600.73 (**8.3%**) Ex. 9, Sched. 1.01 | March 11, 2023 Ex. 9 |
| Sixth Amendment | Sept. 27, 2022 Par. 91 | 124 days after Fifth Amendment | $500,000 (up to $2 million) Par. 91 | $44,753,155.64 Ex. 11 | $458,482.05 (**91.7%**) vs. $41,517.95 (**8.3%**) Ex. 10, Sched. 1.01 | Earlier of March 11, 2023, or acceleration of obligations Ex. 10 |
| First Forbearance Agreement | Sept. 27, 2022 Par. 86 | 0 days after Sixth Amendment | N/A | $44,753,155.64 | N/A | Earlier of October 31, 2022, or "Forbearance Termination Event" Par. 86 |
| Second Forbearance Agreement | Nov. 8, 2022 Ex. 15 | 42 days after First Forbearance Agreement | N/A | $44,753,155.64 | N/A | Earlier of November 30, 2022, or "Forbearance Termination Event" Ex. 15 |

## **ARGUMENT**

I.    **Under the Standard That Governs Motions to Dismiss, Barings' Argument that Plaintiff's Claims Lack Plausibility Must Be Rejected.**

The purpose of a motion to dismiss under Rule 12(b)(6) "is to test the sufficiency of the complaint, not to resolve disputed facts or decide the merits of the case." *In re Evergreen Energy, Inc.*, 546 B.R. 549, 557 (Bankr. D. Del. 2016) (internal quotation marks and citation omitted). Thus, when considering a Rule 12(b)(6) motion, a court must accept as true the allegations in the complaint and its attachments, as well as reasonable inferences construed in the light most favorable to the plaintiff. *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002). To survive dismissal under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint states a plausible claim for relief if its "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 679. As a general rule, the court may not consider matters extraneous to the pleadings without converting the Rule 12(b)(6) dismissal proceedings to summary judgment proceedings subject to Rule 56. *Higgins*, 281 F.3d at 388; *see* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.").

Ultimately, evaluation of a complaint upon a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* The complaint should be read as a whole, not parsed piece-by-piece. *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.D.C. 2009). For this reason, courts often find that "the factual issues [surrounding

9

recharacterization and equitable subordination] cannot be resolved on [a] Motion to Dismiss." *See, e.g., LaMonica v. Tilton (In re TransCare Corp.)*, 602 B.R. 234, 244-45 (Bankr. S.D.N.Y. 2019) (a debt-to-equity recharacterization claim could not be decided on a motion to dismiss because factors weighed in both directions and "the recharacterization question is intensely factual"); *Friedman's Liquidating Tr. v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 525 (Bankr. D. Del. 2011) (same); *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 582 (Bankr. D. Del. 2012) (same); *see In re LMI Legacy Holdings, Inc.*, No. 13-12098 (CSS), 2017 WL 1508606, at \*13 (Bankr. D. Del. Apr. 27, 2017) (with respect to a claim for equitable subordination, "[t]he nature of the underlying conduct (and, at least arguably, any resulting injury) will have to be fleshed out as a factual matter—a task that is, of course, inappropriate when considering the motions under Rule 12(b)(6).") *aff'd,* 625 B.R. 268 (D. Del. 2020).

So long as a recharacterization complaint "plead[s] facts to trigger the applicability" of the factors that courts typically weigh in determining whether to recharacterize a transaction, "or a meaningful subset of [those factors]," the motion to dismiss must be denied. *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 94 (Bankr. S.D.N.Y. 2016) (citation and internal quotation marks omitted); *accord In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 75 (Bankr. S.D.N.Y. 2007), ("If the Court were faced with allegations that addressed some, but less than all, of the relevant recharacterization factors, it might find there to be issues of fact precluding dismissal under Rule 12(b)(6).") *aff'd in part sub nom.*, 390 B.R. 64 (S.D.N.Y. 2008). So too on the issue of equitable subordination—"The facts alleging inequitable conduct . . . in the Complaint [may be] broad, but. . . not so lacking that th[e] Court should grant . . . a motion[] to dismiss. *MI Legacy*, 2017 WL 1508606, at \*13.

A.    **The Complaint States a Plausible Claim for Recharacterization of the Alleged Loans Under the *AutoStyle* Factors (Count I).**

Barings does not dispute that Plaintiff pleads facts to trigger the applicability of factors that courts typically weigh in determining whether to recharacterize a transaction. It argues instead that Plaintiff's allegations "consist of a few discrete, non-dispositive facts taken out of context" and proffers its own independent analysis and summary of the non-public documents it attached as exhibits to the Motion to Dismiss to dispute Plaintiff's averments and argue the merits thereof. *See, e.g.*, Mot. at 4, 16-17. But the parties are not yet at the summary judgment stage. Accepting as true the allegations in the Complaint and construing reasonable inferences in the light most favorable to Plaintiff, as the Court must on a motion to dismiss, the Complaint states a valid claim for recharacterization of the purported Loans as equity.

The focus of the recharacterization analysis in the Third Circuit is "whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." *Friedman's*, 452 B.R. at 518. Recharacterization is therefore, by its very nature, a fact-intensive inquiry that cannot be resolved solely based on underlying documents. *United States v. State Street Bank & Tr. Co.*, 520 B.R. 29, 72 (Bankr. D. Del. 2014).

Courts generally consider non-determinative factors to help discern the parties' intent in recharacterization claims, though, as Judge Ambro cautioned in *Submicron*, recharacterization turns on "facts that confer context case-by-case" and "[n]o mechanistic scorecard suffices" to guide the inquiry ("[a]nd none should, for Kabuki outcomes elude difficult fact patterns"). *SubMicron*, 432 F.3d at 455-56. These factors (the "*AutoStyle* Factors") can include, but are not limited to:

(i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or inadequacy of capitalization; (vi) the identity of interest between the creditor and the stockholder; (vii) the security, if any for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments.

*In re Exide Techs., Inc.*, 299 B.R. 732, 740 (Bankr. D. Del. 2003) (quoting *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 750-53 (6th Cir. 2001) (adopting eleven-factor test set forth in *Roth Steel Tube Co v. C.I.R.*, 800 F.2d 625, 630-32 (6th Cir. 1986)); *see* Mot. at 19 (citing cases where other factors may be considered). "***Which course a court discerns is [nonetheless] a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore, the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity)***." *SubMicron*, 432 F.3d at 456 (emphasis added).

### i.    There Was a Clear Identity of Interest Between Barings and the Debtors, Barring an Arm's Length Negotiation.

"[T]he paradigmatic situation for recharacterization [is] where the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditors' claims." *Adelphia.*, 365 B.R. at 74-75.

The Complaint alleges that Barings is the $65 million investor and 54% majority interest holder in GigaSphere Holdings—the parent and sole owner of all remaining Debtors. Compl. ¶¶ 19-24. As such, Barings had the right to appoint three of the five Managers to the Board of GigaSphere Holdings, which made decisions for all Debtors, and to hire (or fire) the CEO of

12

GigaSphere Holdings, which holds the fourth seat on the Board. Barings' appointees and the CEO would then appoint the fifth Manager to the Board. *Id.* ¶ 25. Plaintiff also alleges the Board's complete management authority over the business and affairs of the Debtors, subject only to certain limited exceptions. *Id.* ¶¶ 29 & 30.

"The primary factor [a] Court is to consider when evaluating whether funds advanced by a shareholder are the result of an equity contribution or a loan is whether the transaction bears the earmarks of an arm's length negotiation." *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997). Plaintiff has adequately pleaded that the purported Loans at issue resulted from Barings' exercise of leverage and control over the Board and, thus, were "Interested Transactions" not negotiated at arm's length. Compl. ¶¶ 41, 104, 119. Barings' pervasive operational and financial control over the Debtors is well-detailed in the Complaint, and the Complaint avers unambiguously that one of the Barings Managers seated on the Board executed the Loan Documents ***on behalf of both Barings and the Debtors***. Compl. ¶¶ 12-15, 53-54, 61-62, 68-69, 74-75, 82-83, 87-88 & 92-93; Ex. 12. There can be no dispute as to the sufficiency of Plaintiff's allegations that the Loan transactions did not bear the earmarks of an arm's length negotiation:

- "Barings is an 'insider' as that term is defined by section 101(31) of the Bankruptcy Code." Compl. ¶ 33.
- "At the time of the Initial Loan Agreement [and the First and Second Amendments], Individual Defendants Sandoval, deButts, and Reddy were employed by Barings LLC and served as the Barings Mangers." *Id.* ¶¶ 40, 54, 62.
- "The Initial Loan Agreement [and the First and Second Amendments] constituted [ ] 'Interested Transaction[s]' under the A&R LLCA and [were] approved by the Board through a Written Consent . . . executed by, among others, Individual Defendants Sandoval, deButts, and Reddy." *Id.* ¶¶ 41, 55, 63.
- The First and Second Amendments were "executed by . . . Individual Defendant Matthew Sandoval, on behalf of Barings in its respective capacities as collateral agent and lender." *Id.* ¶¶ 53, 61.

13

- "At the time of the Third, [Fourth, Fifth, and Sixth Amendments and the Forbearance Agreements], Individual Defendants Sandoval, deButts, and Niedzwiecki were employed by Barings LLC and served as the Barings Managers." *Id.* ¶¶ 69, 75, 83, 88, 93.

- "The Third [Fourth, Fifth, and Sixth Amendments, and the Forbearance Agreements] constituted [ ] 'Interested Transaction[s]' under the A&R LLCA and [were] approved by the Board through a Written Consent . . . executed by, among others, Individual Defendants Sandoval, deButts, and Niedzwiecki." *Id.* ¶¶ 70, 76, 84, 89, 94.

- The Third, Fourth, Fifth, and Sixth Amendments and the Forbearance Agreements were "executed by . . . Individual Defendant Matthew Sandoval, on behalf of Barings in its respective capacities as collateral agent and lender." *Id.* ¶¶ 68, 74, 82, 87, 92.

- "Each of the transactions under the Loan Documents constituted an "Interested Transaction" under the A&R LLCA." *Id.* ¶ 167; *see id.* ¶¶ 41, 55, 63, 70, 76, 84, 89, 94.

- "Notwithstanding the representations in each of the Written Consents, none of the Barings Managers was a "non-interested Manager[] on the Board." Thus, each of the Written Consents approving each of the Loans was executed by three of three interested Barings Managers." *Id.* ¶ 168; *see id.* ¶¶ 40, 54, 62, 69, 75, 83, 88, 93.

The Complaint sufficiently pleads, and the economic reality of the circumstances show, that the transactions at issue here were *not* akin to those between a banker and a borrower; instead, Barings had a seat at both sides of the table. "'Identity of interest' . . . occurs when the interests of the shareholder/lenders and the corporation are so entwined that an arm's-length relationship is unlikely." *State St. Bank and Tr. Co.*, 520 B.R. at 77 (citing *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 698 (3d Cir. 1968)); *In re Province Grande Olde Liberty, LLC*, 655 F. App'x 971, 974 (4th Cir. 2016) (affirming lower court's finding that identity of interest factor weighed in favor of recharacterization where the "Debtor's principals negotiated the settlement agreement and note purchase on behalf of" the lender and the debtor and shareholder's interests aligned). Case law is clear that the less an exchange appears to reflect the characteristics of an arm's length transaction, the more likely it is to be treated as equity. *Cf. AutoStyle*, 269 F.3d at 750 (quoting *Cold Harbor*, 204 B.R. at 915).

14

Barings, however—unable to dispute the sufficiency of Plaintiff's allegations of the "paradigmatic" situation for recharacterization—purports to summarily dismiss these critical facts as "irrelevant." Mot. at 17; *but see In re BH S & B Holdings LLC*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009), *aff'd as modified,* 807 F. Supp. 2d 199 (S.D.N.Y. 2011) ("The 'paradigmatic' recharacterization case involves a situation where 'the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.'"). It instead shifts focus in the Motion to Dismiss to the proportion of contributions in connection with the purported financings, stating incorrectly that this factor cannot weigh in favor of recharacterization because "the funds at issue came from a single source, *Barings*." Mot. at 16-17 (emphasis added).

This is expressly contrary to the allegations in the Complaint, and, as it happens, refuted by the exhibits attached to the Motion to Dismiss. The Complaint defines "Barings" as Barings LP and Barings Blocker. As alleged in the Complaint, and as the exhibits show, Barings LP and Barings Blocker provided the purported financing in the same ratio as their respective equity investments in the Units Purchase Agreement[7]—i.e., 91.7% for Barings LP to 8.3%. for Barings Blocker. Compl. ¶ 43; Ex. 5 Sched. 1.01 (reflecting 91.7% to 8.3% contribution ratio); Ex. 6 Sched. 1.01 (reflecting 91.7% to 8.3% contribution ratio); Ex. 7 Sched. 1.01 (reflecting 91.7% to 8.3% contribution ratio); Ex. 8 Sched. 1.01 (reflecting 91.7% to 8.3% contribution ratio); Ex. 9 Sched. 1.01 (reflecting 91.7% to 8.3% contribution ratio); Ex. 10 Sched. 1.01 (reflecting 91.7% to 8.3% contribution ratios); *see, e.g., In re HH Liquidation, LLC*, 590 B.R. 211, 294 (Bankr. D. Del. 2018)

---

[7]    Without discovery, it is unclear whether other minority shareholders even had an opportunity or ability to contribute.

US.359008610.02

("If stockholders make advances in proportion to their respective stock ownership, an equity contribution is indicated.") (citing cases).

The Complaint here adequately pleads that Barings had total control of both sides of seven self-interested transactions, none of which was negotiated at arm's length,[8] and in each of those seven transactions, Barings LP and Barings Blocker infused capital into the Debtors in the same ratios as their initial equity investments. The identity of interest factor weighs strongly in favor of recharacterization.

### ii.    *The Debtors Were Undercapitalized at All Relevant Times.*

A debtor is undercapitalized "if it cannot generate enough cash flow to sustain operations at the time of the transfer or obligation." *Autobacs Strauss*, 473 B.R. at 552 (internal quotation marks and citation omitted). "Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans." *Friedman's,* 452 B.R. at 522. "[W]hen a corporation is undercapitalized, a court is more skeptical of purported loans made to it because they may in reality be infusions of capital." *SubMicron*, 432 F.3d at 457 (quoting *AutoStyle*, 269 F.3d at 746–47). Capitalization, which is assessed both at the times of initial capitalization and subsequent transactions," is an issue that "often turn[s] on questions of fact." *Autobacs Strauss*, 473 B.R. at 553, 576.

The Complaint unambiguously alleges that the Debtors were undercapitalized when the Initial Loan Agreement was executed and remained severely undercapitalized through the execution of all six Amendments to the Loan Agreement. The Complaint is replete with allegations regarding the Debtors' poor financial condition and cash position at all relevant times:[9]

---

[8]    The two forbearance agreements suffer the same infirmity.

[9]    *See also* First Day Decl. ¶ 17 ("The Company has suffered recurring losses from operations and negative cash flows from operating activities for the past several years.").

- "[F]rom the respective dates of their formation, the Debtors continued to lose money through operations and repeatedly needed fresh capital to stay afloat." Compl. ¶ 36.

- "[A]t the time of the closing of the Initial Loan Agreement, the Debtors' trailing twelve-month consolidated EBITDA was approximately negative $5.5 million and the Debtors' businesses had failed to generate consolidated revenue of over $5.0 million in any of the previous three quarters." *Id.* ¶ 42.

- "Despite the significant capital infusion provided under the Initial Loan Agreement and First Amendment, . . . the Debtors' revenue remained stagnant and consolidated free cash flow and EBITDA remained steeply negative through June 2021." *Id.* ¶ 59.

- "As evidenced by the amendments made by the Fourth Amendment to the EBITDA Covenant and Gross Revenue Covenant, as of the Fourth Amendment Effective Date, the Debtors' financial condition was not expected to improve." *Id.* ¶ 79.

- "Barely a month after execution of the Fifth Amendment, the Debtors' spiraling financial performance resulted in a breach of the EBITDA Covenant that triggered an event of default under Section 8.01(b) of the Loan Agreement." *Id.* ¶ 85.

- "[T]he Debtors' trailing twelve-month consolidated EBITDA for the month ending immediately prior to Sixth Amendment Effective Date was approximately −$7.8 million." *Id.* ¶ 95.

- "Barings elected–over the course of a two-year period, through seven separate installments—to pile money into the Debtors even when previous installments failed to improve the Debtors' financial condition. At the time of each of the Loans, the Debtors were inadequately capitalized, estimating negative EBITDA and negative gross revenue for the foreseeable future. Barings knew when it made each of the Loans that the new capital would only permit the Debtors to continue to operate for a handful of months." *Id.* ¶ 109.

- "Barings knew that each of the Loans, when made, would only give the Debtors enough runway to operate for an additional 2–4 months at a time." *Id.* ¶ 122.

Rather than confronting the sufficiency of the allegations as to the Debtors' inadequate capitalization, Barings instead disputes their weight and presents arguments and justifications therefor (*e.g.*, the COVID-19 pandemic), which it contends "fatally undermine *the notion* [of] the Debtors' alleged undercapitalization." Mot. at 15 (emphasis added). At this point in the proceeding, however, the Court must accept as true all nonconclusory factual allegations in the Complaint, which undeniably aver that the Debtors were undercapitalized to the point of insolvency. *See, e.g., Bagic v. Univ. of Pittsburgh*, 773 F. App'x 84, 87 (3d Cir. 2019) ("A district court may not weigh

17

the credibility of the parties' positions on a question of disputed material fact at the motion to dismiss stage.") (cleaned up).

Barings also argues that its subsequent advances to the Debtors should be viewed under a different standard—that is, the "preexisting lender" standard—because Barings was simply protecting its existing loan. Mot. at 15. This argument ignores that when Barings *became* a lender on October 23, 2020, it had been a 54% controlling interest holder in GigaSphere Holdings since November 7, 2019, with full knowledge of the Debtors' historical poor financial performance, including with respect to their prior indebtedness (Compl. ¶¶ 36 & 42), and awareness that more cash infusions would be necessary to keep the Debtors afloat. Barings (or more accurately, Barings LP and Barings Blocker) nonetheless continued to inject funds into the Debtors every few months, in the same proportions as their initial investments, for two years, presumably, in the hopes of achieving a return on their investment, as equity owners would, without *ever* demanding any cash payments on either principal or interest. Compl. ¶ 108; *id.* ¶ 113 ("Barings agreed to extend the maturity date three times, for a total of nearly 17 months, and did not (i) require a paydown of capitalized PIK Interest, reaffirmation of the debt or perfection of its liens, or (ii) charge any fees to do so, as is normal with an arm's length secured loan."). Thus, contrary to Barings' contentions in Motion to Dismiss, Barings' actions cannot be viewed through the same lens as that reserved for an arms' length lender faced with the nascent financial hardship of a borrower. Instead, the allegations make clear that this is a case where the "transactions were improper or unusual as debt investments." *SubMicron*, 432 F.3d at 457. This factor also weighs strongly in favor of recharacterization.

### iii.    *Barings' Only Hope of Repayment Turned on the Success of the Debtors.*

The core of the recharacterization analysis is whether "the parties infusing funds [did] so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes;

therefore, the funds are debt) or as an investor (the funds infused are based on the borrower's fortunes; hence, they are equity)." *SubMicron*, 432 F.3d at 456; *see In re Lane*, 742 F.2d 1311, 1314 (11th Cir. 1984) ("Articulating the essential difference between [debt and equity] is no easy task. Generally, ***shareholders place their money at the risk of the business while lenders seek a more reliable return.***") (internal quotation marks and citation omitted) (emphasis added). "If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution." *Friedman's,* 452 B.R. at 521 (quoting *AutoStyle*, 269 F.3d at 751).

The Complaint more than adequately pleads that repayment of the Loans necessarily depended on the Debtors' success (Compl. ¶¶ 59, 60, 108) and there are no allegations in the Complaint by which the Court could infer that Barings' contributions totaling $44,753,155.64, within a two-year period—where the Debtors started with an EBITDA of –$5.5 million (*id.* ¶ 42) and ended with an EBITDA of –$7.8 million (*id.* ¶ 95)—constituted traditional lending transactions that contemplated a reliable return. *See Lane*, 742 F.2d at 1314. Rather, the Complaint alleges that Barings was a $65 million investor and 54% controlling interest holder of GigaSphere Holdings, and thus, had a vested interest in the Debtors' success. *Id.* ¶¶ 22, 24 & 108. It also alleges that Barings never demanded or received cash interest payments or principal repayment at any point during the life of the Loans, notwithstanding various defaults—despite entry into numerous Amendments and forbearance agreements, which could have required partial paydown. *Id.* ¶¶ 57, 65, 72, 80 & 96, 108-09; First Day Decl. ¶ 19. And Barings goes so far as to concede in the Motion to Dismiss that Barings delayed its collection efforts pending the results of the Debtors' fundraising and sale efforts (which, if successful, would almost certainly require Barings to accept some form of equity for the capital infusions). Mot. at 6 n.8. Based on the facts alleged in the

19

Complaint, the Court can draw the "commonsense conclusion" that Barings did not intend repayment on the purported Loans absent success of the Debtors. *SubMicron*, 432 F.3d at 456. This factor, too, weighs in favor of recharacterization.

> ### iv.    The Complaint Adequately Alleges the Debtors' Inability to Obtain Financing from Outside Lending Institution.

"When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans." *Friedman's,* 452 B.R. at 522-23. The proper question here is "whether a reasonable outside creditor would have made a loan to the debtor on similar terms." *AutoStyle*, 238 B.R. at 350.

Barings swings hard in the Motion to Dismiss at the purported conclusory nature of Plaintiff's allegation that the Debtors' "significantly impaired financial condition prevented their ability to obtain outside financing from a third-party source, particularly on the same terms and conditions of the Loans." Mot. at 17 (citing Compl. ¶ 111). But in that same round at bat, it acknowledges precisely the reason for the absence of evidence of other outside financing: "the same individuals that controlled the Debtors controlled Barings." *Id*. at 18 (citing Compl. ¶ 111). As Barings continues to stress throughout the Motion to Dismiss, the documents provided to Plaintiff pursuant to the NDA were provided by *Barings*—which was at all times an interested party. Plaintiff has not yet had an opportunity to conduct formal discovery, including depositions, to determine whether the Debtors could have obtained loans on similar terms, or otherwise obtain expert testimony as to whether the Loan terms were market. But documents referenced in the Complaint, and of which the Court can take judicial notice, make clear that true discovery is required. *See* First Day Decl. ¶ 26 ("By the summer of 2022, the Company was running out of cash

and was unable to secure additional financing or investment capital to finance additional growth or support operations.").

Moreover, where, as here, the Complaint adequately alleges that Barings contributed a total of $44,753,155.64, within a two-year period, without a requirement for *any* periodic payments on interest or principal—where the Debtors started with an EBITDA of –$5.5 million (Compl. ¶ 42) and ended with an EBITDA of –$7.8 million (*Id.* ¶ 95), the Court, construing the allegations in the light most favorable to Plaintiff and drawing on its experience with arm's length lending situations, can reasonably infer the unlikelihood that a reasonable outside creditor would have made loans to the Debtors on similar terms as those presented by the Debtors' $65 million investor and majority interest holder. This factor also weighs in favor of recharacterization.

> ### *v.*   *The Existence of a "Loan Agreement" Cannot be Regarded as Conclusive in a Recharacterization Inquiry.*

While some courts have observed that "The absence of notes or other instruments of indebtedness is a strong indication that the advances were capital contributions and not loans," *Friedman's,* 452 B.R. at 520, this factor presents as contrary to the inherent nature of the *recharacterization* inquiry—i.e., one that generally assumes a starting point of purported debt. As other courts have stated, this factor "cannot be regarded as conclusive, or even particularly strong evidence, as placing significant weight on the label given to the transaction . . . would have the effect of rendering moot much of the inquiry into the nature of the transaction." *Cold Harbor Assoc., L.P.*, 204 B.R. at 916 (holding that purported loans evidenced by promissory notes were actually equity contributions); *see Friedman's*, 452 B.R. at 518 ("The focus of recharacterization in the Third Circuit is 'whether the parties *called an instrument one thing when in fact they intended it as something else*.'") (quoting *SubMicron*, 432 F.3d at 456) (emphasis added). Moreover, this factor should be afforded minimal weight where, as adequately alleged in the

Complaint, Barings was on both sides of the transactions at issue and had complete control over documentation of the transactions, and the labels set forth therein—all of which stand in stark contrast to Barings' conduct during the life of the Loans. Compl. ¶¶ 24, 25, 32, 104, & 105 ("[T]he Loans represent equity contributions to the Debtors" regardless of the titles Barings chose to apply to the Loan Documents."); *see SubMicron.*, 432 F.3d at 456 (acknowledging the elusive recharacterization case where a "Note" with conventional repayment terms reflects an amount proportional to prior equity interests and whose payment terms are ignored).

> ### vi.    The "Fixed" Maturity Date Was Repeatedly Extended and Never Enforced.

Courts have also held that the failure to enforce a stated fixed maturity date weighs in favor of recharacterizing a loan as equity. *See Autobacs Strauss*, 473 B.R. at 573-74 (finding this factor weighed in factor of recharacterization where the loan contained fixed repayment dates, but debtor was not required to make principal payments as they came due); *see also State Street Bank & Tr. Co.*, 520 B.R. at 76 (recognizing that courts view a creditor's willingness to postpone repayment of indebtedness as characteristic of equity).

As set forth above, while the Loan Agreement here identifies fixed maturity dates, the Complaint sufficiently alleges that all such maturity dates were illusory because they were repeatedly extended and, like events of default, never enforced. Compl. ¶¶ 106, 110, 113. As the Complaint alleges, Barings, "As an insider with in-depth information and knowledge of the Debtors' business, . . . knew that each of the Loans, when made, would only give the Debtors enough runway to operate for an additional 2–4 months at a time," (*id.* ¶ 122), and thus never intended to demand repayment or enforce the Loans when they came due. *Id.* ¶¶ 106 & 110.

Barings argues that "courts have repeatedly found that a lender's decision to extend a loan agreement's fixed maturity date—even if the extension was intended solely to avoid the borrower's

default—does not weigh in favor of recharacterization." Mot. at 12. But here, the basis for recharacterization is not simply that Barings extended the maturity date on three occasions; it also ignored various defaults (Compl. ¶ 110), never attempted to foreclose on its collateral (*see id.* ¶ 46), and instead of enforcing the maturity date, continued to forbear on the purported debt through the commencement of the Debtors' chapter 11 cases on January 16, 2023—well beyond the November 30, 2022, second forbearance deadline that Barings attempts to include in the record through its Motion to Dismiss. *See* Mot. at 8 n.9. This is precisely the elusive recharacterization case where a "Note" with conventional repayment terms reflects an amount proportional to prior equity interests and whose payment terms are ignored, and the Motion to Dismiss should be denied for this reason as well. *SubMicron,* 432 F.3d at 456; *see In re Atlantic Rancher, Inc.*, 279 B.R. 411, 437 (Bankr. D. Mass. 2002) (recharacterizing a loan as an equity contribution where despite proper documentation of maturity dates and interest rates, the creditor never made any effort to collect the note, thus treating it as an investment).

> ### vii.    *Interest Automatically Accrued as PIK Interest Without Any Demands for Cash Payment or Modification of the "Loan Agreement."*

"The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans." *AutoStyle*, 269 F.3d at 750.

Like the "fixed" maturity date discussed above, the Complaint acknowledges that "[t]he Loans accrued interest at the rate of 12% per annum, payable on the last business day of each calendar quarter. Compl. ¶ 44. It alleges further, however, that the Loan Agreement was structured with a PIK toggle, which, on its face, afforded the Debtors the "option" to pay interest in kind—i.e., capitalized on the outstanding principal—because Barings acknowledged, at the outset, that the Debtors would be unable to service the quarterly interest payments in cash. *Id.* The Complaint also alleges that if the Debtors did not pay cash interest on any interest payment date, a PIK

23

Election would automatically deemed to have been made. *Id.* Given Barings' alleged acknowledgement, as of the time of the Initial Loan Agreement, of the Debtors' inability to service the quarterly interest payments in cash, the PIK toggle was illusory. *See id.* ¶¶ 44 & 106. And in fact, the Board never once elected, nor did the Debtors ever make any cash interest payment during the life of the purported Loans. *Id.* ¶¶ 106, 108, 110, 114.

In response, Barings contends that "the Loan Agreement did not require—and Barings did not have the right to demand—that GigaMonster make cash interest or principal payments during the term of the Loan." Mot. at 12. But this ignores entirely that the Loan Agreement was amended *six times* in two years. *See generally* Compl. Despite its entry into *six Amendments*, Barings never once sought to modify this term, nor did it seek a partial paydown of interest or principal in connection with its agreements to forbear*, as one might expect from a true lender. Compl. ¶¶ 106, 108, 110, 114. As of the commencement of the chapter 11 cases, the balance of the purported Loans instead increased—to approximately $48,969,079.65. D.I. 144; Mot. at 23 n.14. This factor also weighs in favor of recharacterization.

    viii.   **The Economic Reality of the Circumstances Warrants Denial of the Motion to Dismiss.**

As Barings acknowledges in the Motion to Dismiss, "no mechanic scorecard suffices" in connection with the recharacterization inquiry. Mot. at 9 (citing *Submicron*, 432 F.3d at 456). So long as a recharacterization complaint "plead[s] facts to trigger the applicability" of the factors that courts typically weigh in determining whether to recharacterize a transaction, "or a meaningful subset of [those factors]," the motion to dismiss must be denied. *Lyondell*, 544 B.R. at 94 (citation and internal quotation marks omitted).

Plaintiff respectfully submits that, under the standard applicable to motions to dismiss, this Court—drawing on its intimate familiarity with the actions of lenders in response to distressed

24

borrowers in a true arm's length relationship—should find that the Complaint pleads sufficient facts triggering the *AutoStyle* factors. While Barings cites section 3.8 of the A&R LLCA as a purported death knell to Plaintiff's claim, Mot. at 19, it once again ignores that the recharacterization inquiry would be entirely meaningless and unnecessary if the words on a page dictated the outcome; the Court must also consider "what th[e parties] do through their actions, and . . . the economic reality of the surrounding circumstances." *SubMicron*, 432 F.3d at 456. The economic reality of the surrounding circumstances here makes clear that Barings did not act as a true lender; less than a year after investing $65 million and acquiring a 54% majority interest in GigaSphere Holdings (the parent company of all the Debtors), it poured more than $40 million more into the Debtors through *seven* advancements within a period of two years, without ever demanding repayment, paydown, or threatening foreclosure—and instead, forbore, pending the results of the Debtors' fundraising and sale efforts. Mot. at 6 n.8. For these reasons, Plaintiff should be entitled to true discovery (and not simply the universe of confidential documents identified by Barings) in further support of its claims, and the Motion to Dismiss should be denied. *See SubMicron,* 432 F.3d at 456 (acknowledging the elusive recharacterization case where a "Note" with conventional repayment terms reflects an amount proportional to prior equity interests and whose payment terms are ignored).

### B.    The Committee Has Adequately Pleaded Its Alternative Claim for Equitable Subordination (Count II).

To state a claim for equitable subordination, a complaint must allege that: (i) the defendant engaged in some type of inequitable conduct; (ii) the misconduct resulted in injury to the creditors or conferred an unfair advantage on the defendant; and (iii) equitable subordination is not inconsistent with the provisions of the Bankruptcy Code. *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986–87 (3d Cir.1998) (setting forth the three-

25

part test identified in *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977)). While the Third Circuit has declined to adopt misconduct as a formal requirement for equitable subordination, courts have recognized three general categories of what may, in some circumstances, constitute misconduct: "(1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego." *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2007); *see SubMicron*, 432 F.3d at 461 (reaffirming the Third Circuit's decision not to adopt the first generally recognized element as a formal requirement for equitable subordination) (citing *CitiCorp*, 160 F.3d at 986-87)). "The inability to fit neatly the parties' actions within a specific heading does not make the misconduct any less inequitable." *LMI Legacy*, 2017 WL 1508606, at *13 (citing *State St. Bank & Tr. Co.*, 520 B.R. at 84).

### i.    Barings's Secured Claim Warrants Special Scrutiny Because Barings Is an Insider.

"Although there is an initial presumption of validity that attaches to all claims, claims asserted by insiders or fiduciaries demand closer scrutiny." *Mid-Am. Waste.*, 284 B.R. at 69. Thus, "[t]he most important factor in determining whether a claimant has engaged in inequitable conduct for the purposes of equitable subordination is if the claimant was an insider or outsider in relation to the debtor at the time of the act." *Id.* at 69-70. "For non-insider claimants, egregious conduct must be established to justify equitable subordination. However, where the claimant is an insider, the standard for finding inequitable conduct is much lower." *Id.* at 70 (internal citations omitted). "When the creditor is an insider, the proof . . . is not demanding. In such cases, the [plaintiff] need only show 'material evidence' of unfair conduct." *In re Winstar Comms., Inc.,* 348 B.R. 234, 284 (Bankr. D. Del. 2005); *see also Matter of Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts."). "To qualify as [unfair or] inequitable conduct, the insider or fiduciary creditor

must have actually used its power to control the debtor or its position of trust with the debtor to its own advantage or to the other creditors' detriment." *Mid–American Waste,* 284 B.R. at 70; *see Citicorp,* 160 F.3d at 987.

The Complaint adequately pleads that Barings was an insider with full knowledge of the Debtors' poor financial position and performance. Compl. ¶¶ 32-33, 97, 104, 119, 121-22. It also alleges that Barings used its insider status to control the Board and dominate the Board's decision making (*id.* ¶¶ 25, 30, 32 & 107), including to repeatedly request Loans *from Barings* to protect Barings' equity investment, knowing that the funds would only allow the Debtors to operate for only a few additional months as a time. *Id.* ¶¶ 118, 121 & 122. The Complaint further alleges the Debtors' severe undercapitalization, such that the Debtors' continued operations from the Loans misled their general unsecured creditors as to the financial health and viability of the Debtors as a going concern. Barings made the Loans until its purported secured claim totaled nearly $50 million, and all of the Debtors' previously unencumbered assets—which would have been available to satisfy claims of general unsecured creditors—were encumbered. *Id.* ¶¶ 120 & 122. Only then were the Debtors authorized to commence these chapter 11 cases, in which Barings stands to be the only beneficiary as a result of the same Loans.

### ii. *Barings' Conduct Harmed the Debtors' Unsecured Creditors or Conferred an Unfair Advantage on Barings.*

In its Motion to Dismiss, Barings paints itself as nothing but charitable, having acted for the good of the undercapitalized Debtors where no other lender would. Mot. at 21. To this end, it argues that "taking a security interest, without more, does not constitute inequitable conduct" and that Plaintiff's "allegation that the Debtors may have been in financial distress—or even undercapitalized—when Barings made the loans does not change the analysis." Mot at 22. What it ignores entirely is that the continuation of the Debtors' business, through *seven* different Loan

27

transactions that Barings itself offered and accepted, to the point where the Debtors' secured debt exceeded their entire enterprise value and no unencumbered assets remained, benefitted Barings and Barings alone—which now stands first in line for repayment, after looting all possible sources of value for anyone else. Compl. ¶¶ 121 & 122.

Thus, while Barings is correct that obtaining a lien to secure the repayment of indebtedness may not by itself constitute misconduct—assuming misconduct is required, "courts have recognized that obtaining a lien for the purpose of gaining an advantage over other creditors may be inequitable, depending on the circumstances surrounding the act." *State St. Bank & Tr. Co.*, 520 B.R. at 84; *see, e.g., Matter of Fabricators, Inc.*, 926 F.2d 1458, 1468 (5th Cir. 1991) (finding misconduct, when an insider obtained liens "not merely [as] an isolated act, but one step interconnected with a series of actions by [the insider] to gain an advantage over the position of other creditors."); *In re N & D Prop., Inc.,* 799 F.2d 726, 732 (11th Cir. 1986) (finding misconduct based on an insider's actions to encumber the debtor's assets and obtain a priority in the impending bankruptcy proceedings was inequitable to consumer creditors); *In re Daugherty Coal Co., Inc.,* 144 B.R. 320, 327 (N.D. W.V. 1992) (finding misconduct when an insider obtained liens "without going through the appropriate formalities" covering the only significant assets owned by the debtor, and effectively "leap-frogging" over other creditors); *Rodolakis v. Chertoff (In re 1236 Dev. Corp.),* 188 B.R. 75, 84 (Bankr. D. Mass. 1995) (finding misconduct when an insider secured his capital contributions with a lien against the debtor's assets, thereby gaining an unfair advantage and harming the debtor and its creditors).

Barings then ventures far outside the four corners of the Complaint to argue in the Motion to Dismiss that (i) Barings is the one in a far worse position as a result of its decision to lend to the Debtors, and, more strikingly, (ii) that the Debtors' general unsecured creditors should in fact be

28

*thanking* Barings because the Loans allowed the Debtors to continue operating and maintaining business relationships with its trade creditors. Mot. at 23. But these self-serving and unverified representations can be afforded no weight where they directly contradict the allegations in the Complaint. *See* Compl. ¶ 123 ("Barings' inequitable conduct . . . injured other creditors and conferred an unfair advantage in favor of Barings."). If nothing else, Barings' representations raise a question of fact, which cannot be resolved on a motion to dismiss. *Autobacs Strauss*, 473 B.R. at 583 ("[W]hether a creditor's claim should be subordinated is a fact-intensive inquiry which should not necessarily be determined on a motion to dismiss.").

### iii.   *Equitable Subordination of Barings' Secured Claim is Consistent with the Bankruptcy Code*

Barings also argues in the Motion to Dismiss that subordinating its claims would directly contradict the Bankruptcy Code's provision of granting priority to properly perfected secured debt and "unjustifiably disrupt the priority scheme established by Congress." Mot. at 23-24. This argument proves too much; as detailed throughout the Complaint, Barings is only a secured creditor because, rather than commencing a bankruptcy proceeding at an earlier point in time when it was a mere equity holder, it agreed, with itself, to pile nearly $50 million in debt onto the severely undercapitalized Debtors, through seven Loan transactions over a period of two years in an effort to protect its own investment, while taking a first-priority security interest in all of the Debtors' previously unencumbered assets. Barings should not be rewarded under this prong for attempting to manipulate the Bankruptcy Code, and its argument should not move the needle with respect to the Motion to Dismiss. *See In re Marketxt Holdings Corp.*, 361 B.R. 369, 387 (Bankr. S.D.N.Y. 2007) (denying motion to dismiss where complaint charged that "in addition to its position as lender, Softbank held two seats on the Board of Directors, controlled the Board's ability to obtain

US.359008610.02

a quorum and had significant rights as a preferred stockholder, and that it used these powers to its advantage and to the disadvantage of other creditors.").

Not only does section 510(c) of the Bankruptcy Code expressly contemplate the subordination of claims, in *In re 80 Nassau Associates*, the court made the following observation with respect to this element:

> The requirement that subordination must be consistent with bankruptcy law comes into play only after the court has concluded that the first two prongs [of equitable subordination] have been satisfied. Conversely, ***if a court determines that the party advocating equitable subordination has satisfied the first two prongs of the Mobile Steel test, it is difficult to imagine a situation in which equitable subordination would not be warranted by bankruptcy law***. And since the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot.

169 B.R. 832, 841 (Bankr. S.D.N.Y 1994) (emphasis added); *see Citicorp,* 160 F.3d at 990 (availability of alternate remedies under the Bankruptcy Code does not make equitable subordination incompatible with the provisions of the Bankruptcy Code). As discussed above, the Complaint's allegations satisfy the first two prongs of the inquiry and, thus, demonstrate that subordination of Barings' claim is consistent with the basic goal of equality of distribution in bankruptcy. Plaintiff has met the pleading standard required at the Rule 12(b)(6) stage and Barings' Motion to Dismiss must be denied with respect to Count II.

### C.    Assuming Recharacterization or Subordination, the Complaint States a Plausible Claim for Avoidance and Recovery of the Prepetition LF Transfers (Count III).

To state a claim for constructively fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code, a complaint must allege that the challenged transfer was made for (a) less than reasonably equivalent value and (b) at a time when the debtor was or became insolvent, the transfer

30

left the debtor with unreasonably small capital, or the debtor intended or believed it would incur debts beyond its ability to pay. 11 U.S.C. § 548(a)(1)(B).

> **i.**  ***The Complaint Adequately Alleges a Lack of Reasonably Equivalent Value.***

To determine reasonably equivalent value, the Third Circuit requires a "totality of the circumstances" analysis, taking into account "the good faith of the parties, the difference between the amount paid and the market value, and whether the transaction was at arm's length." *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002). ***Reasonably equivalent value is inherently a "fact-intensive determination that typically requires testing through the discovery process*****.**" *In re Charys Holding Co. Inc.*, 443 B.R. 628 (Bankr. D. Del. 2010) (emphasis added).

The Complaint alleges that the Debtors received less than reasonably equivalent value in exchange for their payment of *Barings'* legal fees (i.e., not their own) (the "Legal Fees"), totaling at least $31,660.20 within the two years prior to the Petition Date. Compl. ¶¶ 125-26. It alleges further that the Debtors' agreement to pay the Legal Fees was premised on section 11.04 of the Loan Agreement, which, on each occasion of execution, constituted an "Interested Transaction" approved by three of three interested Barings Managers—conduct expressly prohibited by the A&R LLCA. *Id.* ¶¶ 35, 41, 55, 63, 70, 76, 84, 89, 94, 104, 119, 159, & 167. And if the Loans are recharacterized or Barings' secured claim is subordinated, the legal obligation dissipates, rendering the Legal Fees unnecessary and without value. Given these allegations, it is incorrect for Barings to assume that the Legal Fees constituted an "antecedent" debt—i.e., a preexisting legally enforceable obligation.

Nevertheless, Barings, once again putting the cart before the horse, argues that transfers made to secure an antecedent debt always constitute "reasonably equivalent value," in purported reliance on *In re Aphton Corp.*, 423 B.R. 76 (Bankr. D. Del. 2010). Mot. at 25-26. Critically,

31

*Aphton* does not support dismissal on this ground. Not only did the court in *Aphton* deny the defendant's motion to dismiss, it recognized that it is "inappropriate" for the court to consider an antecedent-debt argument on a motion to dismiss because the court "may only consider whether the Complaint is facially plausible." 423 B.R. at 93. Further, it is well established in the Third Circuit that the existence of an antecedent debt does not end the inquiry. *See In re Exide Techs.*, 299 B.R. 732, 747-48 (Bankr. D. Del 2003) (rejecting argument that a *per se* rule exists that transfers to secure antecedent debt constitute reasonably equivalent value and acknowledging that determination of reasonably equivalent value is based on a "totality of circumstances"); *see also In re Bayou Steel BD Holdings, L.L.C.*, 642 B.R. 371, 394 (Bankr. D. Del. 2022) (same). Plaintiff has alleged the value was not "reasonably equivalent value." Therefore, at this early stage in the litigation, the inquiry should end.

### ii.    *The Complaint Adequately Pleads the Debtors' Insolvency.*

Contrary to Barings' argument, the Complaint is also replete with allegations of the Debtors' undercapitalization to the point of insolvency. Compl. ¶¶ 36, 42, 59, 79, 85, 95, 109, 122. It further alleges that, as a result of the Loans—and thus, the Loan Documents pursuant to which they were issued, the Debtors were insolvent, had unreasonably small capital, and intended/believed they would incur debts which they would be unable to pay as they matured. *Id.* ¶¶ 85, 109, 110, 127. These allegations are more than sufficient to allege insolvency. *See In re DVI, Inc.*, 326 B.R. 301, 306-07 (Bankr. D. Del. 2005) (finding that allegations that a debtor was undercapitalized from its inception and did not have sufficient assets at the time of the challenged transfers to satisfy obligations, adequately alleged insolvency); *see Adelphia*, 365 B.R. at 75 (the "Committee has made the necessary allegations as to insolvency in its complaint, and a 12(b)(6) motion is not the proper means to determine disputed issues of fact."). Accordingly, the Court should deny the Motion to Dismiss with respect to Count III.

32

> **D.    Assuming Recharacterization or Subordination, the Complaint States a Plausible Claim for Avoidance and Recovery of Post-Petition Legal Fees Under the Final DIP Order (Count IV).**

To state a claim under section 549 of the Bankruptcy Code, a complaint must plead facts to demonstrate "(1) that property of the estate (2) was transferred (3) after the filing of a petition and that such transfer (4) was not authorized by the Code or the Court." *Pardo v. Nylcare Health Plans, Inc.,* 274 B.R. 408, 418 (Bankr. D. Del. 2001).

The Final DIP Order authorized the Post-Petition LF Transfers (i.e., the Legal Fees paid to Barings' counsel pursuant to paragraph 15(c) of the Final DIP Order) contingent on and subject to the Committee's challenge rights under paragraph 19 of the Final DIP Order. Compl. ¶ 134; *see* D.I. 180 at 15(c) (identifying "Prepetition Lenders' Fees and Expenses" as adequate protection for Prepetition Lenders); *id.* at ¶ 19 ("*[T]he stipulations* in respect of the Prepetition Lenders set forth *in Paragraph (D)(ii)* of this Final Order *shall be binding* upon the Debtors and each party in interest, including the Creditor's Committee *unless a challenge is timely commenced.*); *id.* at ¶ (D)(ii)(j) (stipulating that the Prepetition Lenders are entitled to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral). Accordingly, the Committee's right to challenge the characterization and priority of the Loans trumps the Final DIP Order's provisional authorization of the Post-Petition LF transfer. If Plaintiff is successful in recharacterizing the Loans or equitably subordinating Barings' claims, the Post-Petition LF Transfers would have been unwarranted and, thus, unauthorized because Barings would be deemed an unsecured creditor. *See In re Motors Liquidation Co.* 552 B.R. 253, 277 (Bankr. S.D.N.Y. 2016) (denying motion to dismiss where, if debtor succeeded in challenging perfection of noteholder's security interest, payments would not be authorized under DIP order and would therefore be subject to avoidance as unauthorized post-petition transfers).

E.    **The Complaint States a Plausible Claim to Avoid the Security Interest Transfer as a Preference (Count V).**

To state a claim under section 547 of the Bankruptcy Code, a complaint must allege that (1) the challenged transfer involved an interest of the debtor in property; (2) the transfer was made "to or for the benefit of the creditor;" (3) the transfer was made "for or on account of an antecedent debt;" (4) the debtor was insolvent at the time of the transfer; (5) the transfer occurred within the preference period; and (6) the creditor received more than it would have if the case were under chapter 7 of the Bankruptcy Code, the transfer had not been made, and such creditor received payment of such debt to the extent provided by the Bankruptcy Code. 11 U.S.C. § 547.

Barings does not dispute that GigaMonster Networks and Barings LP entered into the Deposit Account Control Agreement ("DACA") on November 5, 2022, within the one year prior to the Petition Date, or any of the other prongs of the of the inquiry under section 547—except prong 6. Mot. at 27. To this end, Barings argues that, because it will continue to retain a perfected security interest over the cash held in the DACA account regardless of whether the DACA is avoided, the Complaint fails to allege that Barings received more than it would have in a case under chapter 7. But continuation of perfection in proceeds is a factual issue not proper for resolution on a motion to dismiss. Barings acknowledges that a DACA is required to perfect a security interest in a deposit account as original collateral. Mot. at 28 (citing UCC § 9-104 cmt. 2). To the extent any funds in the DACA account were original collateral as opposed to proceeds of other collateral, avoidance of the DACA would render the security interest in those funds unperfected. And where proceeds of collateral are commingled with other property (e.g., in a deposit account), UCC § 9-315(b)(2) places the burden on the secured party to "identif[y] the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this article with respect to commingled property of the type involved."

34

Barings has not done that in its Motion to Dismiss—nor could it have, without turning it into a premature motion for summary judgment. Rather, Barings simply asks the Court to *assume* that every dollar in the deposit account is proceeds of other collateral, which the Court cannot do (i) on a Motion to Dismiss where reasonable inferences need to be drawn in favor of Plaintiff, and (ii) on an issue on which Barings bears the burden.

## II.    Plaintiff Should Be Granted Leave to Replead in the Event the Court Determines that Any of the Claims are Inadequately Pleaded.

Should the Court decide that any of Plaintiff's claims against Barings are inadequately pleaded, Plaintiff respectfully requests that the Court grant leave to amend the Complaint in accordance with Third Circuit precedent: "under Federal Rule of Civil Procedure 15(a), leave to amend should be 'freely given when justice so requires,' and we have recognized that 'a district court must permit a curative amendment unless such amendment would be inequitable or futile.'" *Toll Bros., Inc. v. Twp. Of Readington*, 555 F.3d 131, 144 n.10 (3d Cir. 2009) (citation omitted).

## <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiff respectfully requests that the Court deny the Motion to Dismiss.

[*Signature Page Follows*]

US.359008610.02

Dated: August 14, 2023

**FAEGRE DRINKER BIDDLE & REATH LLP**

/s/ *Jaclyn C. Marasco*

Patrick A. Jackson (No. 4976)
Jaclyn C. Marasco (No. 6477)
222 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 467-4200
Facsimile: (302) 467-4201
Emails: patrick.jackson@faegredrinker.com
　　　　jaclyn.marasco@faegredrinker.com

-and-

Richard J. Bernard (admitted *pro hac vice*)
1177 Avenue of the Americas
New York, New York 10036
Telephone: (212) 248-3140
Facsimile: (212) 248-3141
Email: richard.bernard@faegredrinker.com

*Counsel to the Official Committee of Unsecured
Creditors*

36